William JANKLOW, Appellant,

v.

NEWSWEEK, INC., Appellee.

No. 84–1452.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1984.

Decided April 10, 1985.

Rehearing En Banc Granted May 22, 1985.

Arnold, Circuit Judge, filed opinion concurring in part and dissenting in part.

feud started in 1974, when Banks brought charges against Janklow in a tribal court for assault. A 15-year-old Indian girl who baby-sat for Janklow's children had claimed that he raped her in 1969. Federal officials found insufficient evidence to prosecute, but Banks persuaded the Rosebud Sioux chiefs to reopen the case under tribal law. Janklow, who was running for election as state attorney general at the time, refused to appear for the trial. But the tribal court found "probable cause" to believe the charges and barred Janklow from practicing law on the reservation. Eight months later Janklow—who had won his election despite the messy publicity—was prosecuting Banks. And his case—based on the 1973 Custer riot—was successful. Found guilty of riot and assault without intent to kill, Banks jumped bail before sentencing.

Janklow claims that the article is defamatory in three ways. First, he contends that the article omits or falsely reports circumstances surrounding the rape allegation. Second, he contends that the article implies that he was guilty of the rape. Finally, he contends that the article implies that he prosecuted Banks because Banks brought charges against him based on the rape allegation, whereas his prosecution of Banks had started before Banks brought those charges.

The District Court granted summary judgment for Newsweek. Specifically, the Court found, with respect to Newsweek's report of the rape allegation, that there was no genuine issue as to any material fact and that the basic facts reported by Newsweek did occur. The District Court also concluded that the article could not be read to suggest that Newsweek espoused the truth of the rape charge. With respect to the claim that the article implies that Janklow was prosecuting Banks for impermissible personal motives, the District Court concluded that the implication of im-

Joseph Butler, Rapid City, S.D., for appellant.

Lawrence L. Piersol, Sioux Falls, S.D., for appellee.

Before ARNOLD, FAGG and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

The February 21, 1983 issue of Newsweek magazine contained an article entitled *Dennis Banks's Last Stand,* concerning the past and present activities of American Indian activist Dennis Banks and the efforts of South Dakota Governor William Janklow to obtain Banks's return to South Dakota for sentencing on two felony convictions. Janklow brought suit on February 24, 1983 contending that the Newsweek article defamed him.[1]

The primary basis for the suit is a paragraph in the article concerning a "feud" between Banks and Janklow:

Along the way, Banks made a dangerous enemy—William Janklow. Their

---

1. The full text of the article is set forth as an appendix to this opinion.

proper prosecutorial motive amounted to the expression of an opinion and, as such, did not constitute libel. While we agree with the rulings of the District Court as to Newsweek's report of the rape allegation, we believe that the District Court erred in holding as a matter of law that the implication of an impermissible motive for Janklow's prosecution of Banks is opinion. Therefore, we reverse and remand to the District Court.

## I.

■ Janklow's chief argument on appeal is that it is error under South Dakota law to take from a jury the question of whether an article is in fact defamatory when the article is susceptible to a defamatory meaning. We cannot agree with Janklow's reading of South Dakota law. The South Dakota Supreme Court repeatedly has upheld the dismissal of or the granting of summary judgment in defamation actions (including once in a case involving Janklow), even when the article in question was susceptible to a defamatory meaning, where the article was privileged under state or federal law or the record showed no evidence of actual malice.[2] *See Janklow v. Keller,* 90 S.D. 322, 241 N.W.2d 364 (1976); *Hackworth v. Larson,* 83 S.D. 674, 165 N.W.2d 705 (1969). Thus, that the article here in question is susceptible to a defamatory meaning by no means necessitates submission of this case to a jury.

## II.

We turn to Janklow's contention that the District Court erred when it determined that there was no genuine issue as to any material fact and that Newsweek's report of the alleged rape was basically true. Janklow raises three issues in this regard.

First, he identifies specific errors of fact in the article. Second, he objects to Newsweek's omission of certain facts from the article. Finally, he argues that the article implies that he actually was guilty of rape.

The basic facts reported by Newsweek concerning the alleged rape are not in dispute. A young Indian girl did make an allegation of rape against Janklow, federal officials did find insufficient evidence to prosecute, and several years later an Indian court did disbar Janklow on the basis of that allegation. Janklow does not contend that these basic facts are false.

■ Janklow does dispute other facts mentioned in the article. He contends that the rape allegation occurred in 1967, not 1969; that although he was guardian to the Indian girl, she had never been a babysitter for his children; that the Rosebud Sioux Court was run by judges, not by chiefs; that the case never had been "reopened" under Indian law because the tribal court never had dealt with it before; that he had not refused to appear for the Rosebud Sioux proceedings; that he was not a member of the Rosebud Sioux Bar; and that no assault charges were brought against him in the tribal court.[3] The District Court found that these details were not material to the defamatory thrust of the article. We agree. While the truth or falsity of a disputed statement is an issue for the trier of fact, *Schaffer v. Spicer,* 88 S.D. 36, 215 N.W.2d 134, 138 (1974), we do not believe that the District Court erred in finding that in the present case there is no issue as to the truth or falsity of any *material* fact with regard to Newsweek's statements concerning the rape allegation.

Janklow also claims that he was defamed by the omission of several items of fact

---

**2.** The South Dakota Supreme Court has stated that "[w]hether defamatory statements made concerning public officials are actionable is now a matter of Federal Constitutional Law." *Hackworth v. Larson,* 83 S.D. 674, 165 N.W.2d 705, 709 (1969).

**3.** The record does not support Janklow's version of all these facts. The Rosebud Sioux Court specifically found that Janklow was an inactive member of the Rosebud Sioux Tribal Bar and that he had failed to respond to an order to appear before that court. *In re Disbarment of William Janklow,* Civ. No. 74–7840 (Rosebud Sioux Tribal Court Oct. 31, 1974). The disbarment proceedings were brought on several grounds, including Janklow's alleged assault on the Indian girl.

from the Newsweek article. Specifically, he notes that Newsweek failed to include: (1) the fact that Janklow had passed a lie detector test in which he denied the rape while, in another test, a polygraph examiner concluded that the Indian girl was untestable because of the emotions she displayed during the testing; (2) the fact that a medical examination of the Indian girl showed no evidence of rape; and (3) the fact that a number of federal authorities, including the Senate Committee on Labor and Public Welfare, the Office of Counsel to the President, and a United States Attorney had called the rape charges "unfounded." The District Court rejected Janklow's claim that these selective omissions from the story defamed him, noting that courts are not permitted to second-guess the contents of news articles and thereby infringe on the editorial process.

■ We note that the law does not recognize libel by omission as a tort. Libel, by definition, consists of the publication of a false and unprivileged fact. Thus, liability may be imposed in a libel case only for an assertion or implication of fact that is false and unprivileged, and not for mere omission of a relevant fact.[4] For this reason, Newsweek could not be liable solely for its omissions, without regard to whether a material assertion was thereby made untrue. *See* S.D. Codified Laws § 20–11–3.

■ In the present case, Janklow would, of course, have been entitled to prevail with respect to his claim concerning the rape allegation had he demonstrated that Newsweek made a false and unprivileged assertion with the requisite culpability. The District Court determined, after giving the errors and omissions in Newsweek's article due consideration, that there was no dispute as to any material fact, and that the report published by Newsweek concerning the rape allegation was materially true. We have held earlier in this opinion that the District Court did not err in so ruling. To the extent Janklow asks this Court to hold Newsweek liable for omission of those

additional facts that he believes should have been published, but whose omission did not make what was published untrue, we reject his claim.

■ Although our rejection of Janklow's claim that Newsweek should be held liable for its omissions of fact is grounded on our reading of the definition of libel, we additionally believe that the result thereby reached has strong underpinnings in the First Amendment. In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Supreme Court struck down a state law that made punishable as a misdemeanor a newspaper's failure to print the reply of a political candidate to a column by that newspaper attacking the candidate's official record. The Court observed that "[i]t has yet to be demonstrated how governmental regulation of [editorial control and judgment] can be exercised consistent with First Amendment guarantees of a free press...." *Id.* at 258, 94 S.Ct. at 2839. It is an "elementary First Amendment proposition that government may not force a newspaper to print copy which, in its journalistic discretion, it chooses to leave on the newsroom floor." *Id.* at 261, 94 S.Ct. at 2841 (White, J., concurring). While newspapers have long been liable for that which they publish, they have never been liable solely for that which was omitted. *Cf. Berry v. National Broadcasting Company*, 480 F.2d 428 (8th Cir.1973), *cert. dismissed*, 418 U.S. 911, 94 S.Ct. 3203, 41 L.Ed.2d 1157 (1974). We see no constitutionally significant distinction between the law struck down in *Miami Herald*, which made it a misdemeanor not to publish a specific item, and a cause of action that would permit a plaintiff to recover damages based on mere failure to publish a specific item. We believe the law is clear that for a recovery to lie, there must be a showing that what has been omitted has made a material assertion of fact untrue. As already noted, we agree with the find-

---

**4.** A relevant omission may, of course, be considered as evidence of the falsity of an assertion and also as evidence of the culpability of the assertor.

ing of the District Court that Janklow has not made this kind of showing.

Finally, the District Court rejected Janklow's contention that the article could be read to imply that Janklow was actually guilty of the alleged rape, finding that the article was not susceptible to such a meaning. We agree. To the extent the publication of the rape allegation has caused harm to Janklow's reputation, this harm is the result of a materially accurate report of historical fact, not of an assertion by Newsweek that Janklow committed the alleged crime. Because the publication of a materially true statement is constitutionally protected, *Garrison v. Louisiana,* 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964), and because the article in question cannot be read to imply that Newsweek espoused the validity of the rape allegation, we find no error in the District Court's judgment for Newsweek on this claim.

### III.

Janklow also claims that he was defamed because the Newsweek article can be understood to accuse him of prosecuting Banks in order to revenge himself for Banks's resurrection of the rape charge. Though finding the article to be susceptible to such a meaning,[5] the District Court characterized the expression as one of opinion, and applied the rule that statements of opinion do not constitute libel.[6] We dis-

agree with the District Court's characterization of the expression in question as being opinion rather than fact.

We begin our analysis by noting that the District Court was correct insofar as it held that opinions are not actionable:

Under the First Amendment there is no such thing as a false idea. However, pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–7, 41 L.Ed.2d 789 (1974) (footnote omitted). Thus, the relevant question in the present case is whether the meaning that can be drawn from the article—that Janklow was prosecuting Banks for revenge—amounts to a statement of fact or an expression of opinion.

Distinguishing fact from opinion in a libel case is often not an easy matter. *See Gregory v. McDonnell Douglas Corporation,* 17 Cal.3d 596, 552 P.2d 425, 428, 131 Cal.Rptr. 641 (1976). It is clear, however, that in determining whether a statement is fact or opinion, a court is not bound "by the semantic nature of the individual assertion ... [but must] turn instead to the totality of the circumstances of the case to determine whether a statement may be actionable." *Ollman v. Evans,* 750 F.2d 970, 1001–02 (D.C.Cir.1984) (en banc) (Bork, J., concurring) (footnote omitted).[7]

---

**5.** The article states that a feud erupted between Banks and Janklow when Banks brought charges against Janklow for the alleged rape. The article goes on to state that Janklow, eight months after the tribal court found probable cause to believe the charges, was prosecuting Banks, and has continued for the past ten years actively to seek Banks's return to South Dakota. The District Court concluded that the article may be read to suggest that Janklow is pursuing Banks because Banks instigated the tribal court action. We read the District Court's use of the word "pursuing" in this context to include Janklow's prosecution of Banks for his part in the 1973 Custer riot, since the Newsweek article implies that the prosecution commenced after Banks instigated the tribal court action. We agree with the District Court that the Newsweek article is susceptible to such an interpretation.

**6.** Janklow asserts that the article's implication of prosecutorial misconduct is false since he was prosecuting Banks for his part in the 1973 Custer riot before Banks brought charges against him. It requires little imagination to view such an implication as being defamatory; the initiation of a criminal action by Janklow against Banks for revenge not only would have been an abuse of Janklow's power as attorney general, but could arguably have been cause for his suspension or disbarment by the South Dakota Supreme Court. *See* S.D. Codified Laws §§ 16–18–16; 16–19–20 to –22; 16–19–33(3); 16–19–35.

**7.** The importance of the totality of the circumstances test is that it looks to all relevant circumstances to determine whether a given statement is actionable. Thus, a comment about

A number of cases illustrate the proposition that it is not the form of an assertion, but rather a consideration of the relevant circumstances, that determines its characterization as fact or opinion under the First Amendment. In *Greenbelt Cooperative Publishing Assn. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), an article reported that a certain developer was "blackmailing" the city. Though this statement on its face would seem to be one of defamatory fact, an examination of the context in which the statement was made revealed that the article merely used the word "blackmail" to describe the developer's negotiating posture and was "no more than rhetorical hyperbole, a vigorous epithet." *Id.* at 14, 90 S.Ct. at 1541. Because the statement could not be viewed as a factual accusation of criminal conduct, it was not actionable.

In *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), a union newsletter had referred to certain employees as "scabs" and had described a "scab" as a "traitor to his God, his country, his family and his class." *Id.* at 268, 94 S.Ct. at 2773. Noting that these charges were made in the context of an ongoing effort by a union to organize employees, a situation in which the use of epithets and harsh rhetoric is not uncommon, the Supreme Court concluded that it was "impossible to believe that any reader of the [newsletter] would have understood the newsletter to be charging the appellees with committing the criminal of-

fense of treason." [8] *Id.* at 285, 94 S.Ct. at 2781. Since no false factual representation could reasonably be inferred from the language used by the newsletter, the publication of those statements was protected. *Id.* at 286–87, 94 S.Ct. at 2782–83.[9]

While an examination of the relevant circumstances may show that a statement that seems to be factual is actually one of opinion, it may also demonstrate the converse. At issue in *Buckley v. Littell*, 539 F.2d 882 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977), was the question of whether a paragraph in an article about William F. Buckley, Jr. was fact or opinion:

> Like Westbrook Pegler, who lied after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and had nothing else to do.

*Id.* at 884–85 n. 1. This statement was held to be actionable, despite Littell's protestations that he was merely expressing an opinion, because Littell's article elsewhere indicated that Pegler's columns had been proved to be libelous. *Id.* at 896. Thus, the court believed the clear meaning to be inferred from Littell's article was that Littell was asserting a proposition of fact, namely, that "Buckley [was] a libeler like Pegler." *Id.*

In *Cianci v. New Times Publishing Company*, 486 F.Supp. 368 (S.D.N.Y.1979), a newspaper article had outlined facts indicating that Cianci had raped a woman and

---

official misconduct made in a coffee shop would almost inevitably be opinion, while "[t]he identical quotation in a newspaper article purporting to publish facts ... would, of course, be quite another matter." *Ollman v. Evans*, 750 F.2d at 990.

8. While *Letter Carriers* did hold that use of the word "traitor" in this context was protected as opinion, it did not hold that use of the word "scab" was similarly protected. Rather, the court seemed to hold that the allegation that plaintiffs were "scabs" was factual, but literally true.

We note with interest Judge Friendly's perceptive observation in *Cianci v. New Times Publishing Company*, 639 F.2d 54, 62 n. 11 (2d Cir.

1980), that Justice Powell dissented in *Letter Carriers*, which was decided on the same day as *Gertz*. Though Justice Powell wrote for the Court in *Gertz* that opinions were not actionable, he would have held the statements in *Letter Carriers* to be actionable, indicating that he, at least, did not believe them to be opinion.

9. Though the statements in *Letter Carriers* were held to be protected under federal labor law, not under the First Amendment, the basis for the protection of the statement that the plaintiffs were traitors was that it was not a statement of fact, and therefore, under *Gertz*, not actionable.

then tried to cover it up. In language similar to that used by the District Court in the present case, the District Court in *Cianci* dismissed the complaint:

> [N]owhere, in the *New Times* article does it state as a matter of fact that Cianci was indicted, officially charged, or guilty of rape.... At most, the article implies that its author is of the opinion that Cianci was guilty of rape. Defendants were constitutionally protected in their expression or implication of that opinion.
>
> ....
>
> In summary, the court holds that to the extent that the *New Times* article may imply or express an opinion that Cianci was guilty of rape or of making an improper payoff to avoid prosecution, such opinion is fully protected under the first amendment....

*Id.* at 373–74.

The Second Circuit reversed in *Cianci v. New Times Publishing Company*, 639 F.2d 54 (2d Cir.1980), holding that the article was susceptible to a defamatory implication that was not protected as opinion. Writing for the Court, Judge Friendly first set out at some length the New Times's account of the results of its investigation into the alleged rape, making it clear that the article as a whole was meant to be a factual account of the events surrounding the controversy, and not merely a collection of charges made in a loose, figurative sense. Noting that the disclosure of factual background could indicate whether a particular statement was one of defamatory fact or protected opinion, *id.* at 65, Judge Friendly reasoned that "[a] jury could find that the effect of the article was not simply to convey the idea that Cianci was a bad man unworthy of the confidence of the voters of Providence but rather to produce a specific image of depraved conduct...." *Id.* at 64. He therefore concluded that "[t]o call such charges merely an expression of 'opinion' would be to indulge in Humpty-Dumpty's use of language." *Id.*

When we examine in light of the foregoing discussion the meaning that can be drawn from the Newsweek article here at issue—that Janklow prosecuted Banks because Banks attempted to bring Janklow to justice for the alleged rape of an Indian girl—we come to the conclusion that the implication of such a statement in the present case is not an expression of opinion, but rather an assertion of fact. We reach this conclusion for several reasons.

First, we note that the language generally used throughout an article may strongly indicate whether it is to be accepted as fact or opinion. Newsweek's account of Janklow's pursuit of Banks, like the New Times's account of the rape in *Cianci*, leaves the impression that it is intended to be factual in nature. Readers would assume from the style, organization, and tone of the article that Newsweek was reporting facts uncovered during the course of investigating the story, and, consequently, they would assume that the facts reported and the inferences that logically flow from those facts should be taken as hard information rather than as an expression of opinion.

Second, a consideration of the forum in which a statement is made may indicate whether it is to be accepted as fact or opinion. Thus, the knowledge that a charge is made in the context of a labor dispute, where exaggeration is commonplace, may alert the reader that the charge is not to be taken as fact. *See Letter Carriers*, 418 U.S. at 286, 94 S.Ct. at 2782. Similarly, in holding that the statements in the Evans and Novak column at issue in *Ollman* were opinion, the District of Columbia Circuit gave great weight to the fact that the column itself appeared in the Op-Ed sections of subscribing newspapers. *See Ollman*, 750 F.2d 970, 990. The article here at issue appeared in the National Affairs section of Newsweek magazine. While it may well be true that readers of an Op-Ed column are aware that the items there published generally consist of the opinions of columnists and do not purport to be "hard news," we believe that readers

of articles in the National Affairs section of Newsweek are likely to think that what they are reading is offered as fact and not opinion.

■ Third, a statement may not have a meaning sufficiently precise for readers to believe that they are reading an assertion of fact. *See Ollman,* 750 F.2d at 979–81. "An assertion that cannot be proved false cannot be held libellous." *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). In *Lauderback v. American Broadcasting Companies,* 741 F.2d 193 (8th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985), a panel of this Court held that the implication that an insurance agent was a crook, a liar,[10] or less than scrupulous was too broad, unfocused, and subjective to be actionable as fact.[11] *See also Lewis v. Time Incorporated,* 710 F.2d 549 (9th Cir. 1983) (assertion that lawyer is shady, unreliable, or disreputable is too broad, unfocused, and subjective to be taken as an assertion of fact). In the present case, the meaning to which the article is susceptible—that Janklow prosecuted Banks for revenge—is not one that is broad, unfocused, or subjective. On the contrary, such an accusation is precisely the kind of specific factual assertion that is not protected by *Gertz. See Cianci,* 639 F.2d at 64.[12]

Finally, even in an article that is published with language and in a manner and forum that otherwise would indicate it is to be taken as fact, there may be cautionary language that lets a reader know that certain statements are not intended to be read as assertions of fact. There is, however, no such cautionary language in the Newsweek article. Of course, to the extent the article attributes to Banks or Janklow statements about the other, readers have reason to be on their guard that such statements may not be purely factual assertions.[13] Newsweek's account of the chronology of Janklow's pursuit of Banks, on the other hand, contains nothing that would alert readers they are reading anything but a report of real events set forth in their actual sequence.

Because we conclude that the meaning that can be drawn from the Newsweek article—that Janklow did not commence prosecuting Banks until after Banks attempted to bring him to justice for the alleged rape of an Indian girl—is factual, we reverse that portion of the judgment of the District Court that held the expression of this meaning to be opinion and therefore nonactionable.[14]

---

**10.** Use of the word "liar" was also held to be opinion in *Edwards v. National Audubon Society,* 556 F.2d 113, 121 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

**11.** The Court rejected a claim by Lauderback that the broadcast was susceptible to the more specific interpretation that he had been indicted for or convicted of a crime. *See Lauderback,* 741 F.2d at 196.

**12.** The dissent would hold that the implication of specific prosecutorial misconduct by Janklow is too broad, unfocused, and subjective to be actionable as fact. *See infra* at 657. It is difficult, if not impossible, to think of a more specific, objective accusation than one that Janklow prosecuted Banks to get revenge for Banks's instigation of the tribal court proceeding. What the dissent really seems to be saying is not that the charge is broad and unfocused, but that the article does not really make such an accusation against Janklow.

The view of the dissent may ultimately prevail in that a jury may decide that the article does not, in fact, make such an accusation against Janklow. That, however, is a jury question; our role is merely to decide whether the District Court properly held that the article is *susceptible to* such a meaning. The District Court so held, and we cannot conclude that it erred in so holding.

**13.** Newsweek argues that it mitigated whatever effect its implication of an improper motive to Janklow might have had by quoting Janklow later in the article as claiming that he was pursuing Banks only because all the other people involved in the Custer riot faced justice. This argument fails for precisely the reason just mentioned in the text of this opinion: the article requires the reader to weigh Janklow's protestations of a proper purpose for his pursuit of Banks not against Banks's "rhetoric," but against Newsweek's factual demonstration to the contrary.

**14.** Because the District Court concluded that the expression was not actionable since it was opinion, the District Court did not address two re-

## IV.

Newsweek urges us to affirm the District Court's summary judgment on any of three grounds, none of which has been ruled on by the District Court: 1) that Janklow failed to adduce sufficient evidence of actual malice to withstand a motion for summary judgment; 2) that the article is protected by S.D. Codified Laws §§ 20–11–5(3) and 20–11–5(4); and 3) that Janklow's suit is barred by S.D. Codified Laws § 20–11–7. We address each of these contentions in turn.

Newsweek first argues that Janklow did not present evidence of actual malice sufficient to withstand Newsweek's motion for summary judgment. Although both Janklow and Newsweek submitted affidavits and other evidence on the issue of actual malice, the District Court did not rule in its memorandum opinion on that issue, nor did it rule on the admissibility of certain evidence offered by Janklow to show the existence of actual malice. There is some evidence in the record that, prior to publication, Newsweek was aware that Janklow was prosecuting a number of the Custer riot cases before Banks brought up the rape allegation. There is also evidence in the record that Newsweek was aware that Banks had a motive for wishing to derail Janklow's candidacy for attorney-general. Moreover, Janklow argues in his brief that Banks himself specifically told Newsweek that Janklow was prosecuting him before he brought up the rape allegation. We cannot say that these circumstances, if shown by clear and convincing evidence, would not demonstrate "a high degree of awareness of ... probable falsity" of the assertion that Janklow' initiated Banks's prosecution for revenge. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct.

1323, 1325, 20 L.Ed.2d 262 (1968) (quoting *Garrison v. Louisiana,* 379 U.S. at 74, 85 S.Ct. at 215).

Newsweek claims that each Newsweek employee involved with the article has sworn that he or she reviewed the article prior to publication and believed it to be true. Such statements are, of course, relevant to the question of whether Newsweek published the article with actual malice. "The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *Id.* at 732, 88 S.Ct. at 1326. The brief submitted by Newsweek to this Court does not specifically take the position that the Newsweek employees responsible for the Banks story believed that Janklow was prosecuting Banks because Banks had resurrected the rape allegation, nor does Newsweek argue that it was unaware of the inference that may be drawn from its statement that "[e]ight months [after the tribal court proceeding] Janklow ... was prosecuting Banks."

In short, we cannot say, on the basis of the record before us, and without benefit of a ruling by the District Court, that the District Court's granting of summary judgment for Newsweek should be upheld on the ground that Janklow has failed to make a sufficient showing of actual malice. We express no opinion on the ultimate resolution of this issue. We merely hold that the issue of actual malice has not been adequately developed to enable us to rule on that issue in this appeal.

Newsweek also claims that Janklow's action is barred by S.D. Codified Laws §§ 20–11–5(3) and 20–11–5(4).[15] Whether

---

maining questions: 1) whether the article did, in fact, communicate to readers the defamatory meaning to which it is susceptible; and 2) whether that meaning is, in fact, false. These are, of course, jury questions.

**15.** S.D. Codified Laws § 20–11–5 reads as follows:

Privileged communications—Malice not inferred from publication. A privileged communication is one made:

....

(3) In a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive

the Newsweek article, or any portion thereof, is a privileged communication within the meaning of either of these subsections is obviously a question of South Dakota law. As such, it should be resolved in the first instance by the District Court, *see United States Jaycees v. Cedar Rapids Jaycees*, 754 F.2d 302, 303 (8th Cir.1985), and we decline to venture now into a legal thicket that the District Court has not yet entered. Such restraint is especially appropriate in this instance since, should Newsweek ultimately prevail on the First Amendment issue of actual malice, any consideration of §§ 20–11–5(3) and 20–11–5(4) would thereby be rendered superfluous. *Cf. Hackworth v. Larson*, 83 S.D. 674, 165 N.W.2d 705 (1969) (section 20–11–5(4) [and therefore by implication § 20–11–5(3)] provides less protection against liability for defamation than does the First Amendment).

■ Finally, Newsweek claims that Janklow's action is barred by his failure to give the pre-action notice required by S.D. Codified Laws 20–11–7.[16] Janklow's complaint was filed on February 24, 1983.

Janklow claims that he spoke on February 16, 17, and 18, 1983 with the four Newsweek employees responsible for writing the Banks article about the particular statements he believed to be false and defamatory, and he contends that such notice is sufficient to satisfy the requirements of § 20–11–7. We believe that this issue of South Dakota law also should be decided in the first instance by the District Court on remand.[17] *See United States Jaycees*, 754 F.2d at 303; *cf. Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 30–31, 101 S.Ct. 1531, 1546–1547, 67 L.Ed.2d 694 (1981).

This case is reversed and remanded to the District Court for proceedings consistent with this opinion.

## APPENDIX

### Dennis Banks's Last Stand

[Caption Under Picture: "Banks in North Dakota (1974): Still battling a man he calls 'Custer reborn' "]

Just hours after conservative Republican George Deukmejian was sworn in as Cali-

---

for the communication innocent, or who is requested by the person interested to give the information;

(4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding or of anything said in the course thereof.

In the cases provided for in subdivisions (3) and (4) of this section, malice is not inferred from the communication or publication.

16. S.D. Codified Laws § 20–11–7 reads as follows:

Retraction notice to newspaper—Punitive damages avoided by retraction—Candidates for office. Before any action for libel can be brought against a newspaper or the publisher, editor, or manager thereof, the party aggrieved must at least three days before the commencement of such action serve a notice on the person or persons against whom said action is to be brought specifying particularly the statement or statements claimed to be false and defamatory. If on the trial it appears that such statement or statements were written or published in good faith and with the belief founded upon reasonable grounds that the same were true, and a full and fair retraction of the erroneous matter correcting any and all misstatements of fact therein contained was published in the next issue of the

paper, or in the case of a daily paper within three days after the mistake was brought to the attention of the publisher, editor, or manager in as conspicuous type as the original statement and the same position in the paper, the plaintiff will be entitled to recover no punitive damages. But if the libel is against a candidate for office the retraction must also be made editorially in the case of a daily paper at least three days and in the case of a weekly paper at least ten days before the election.

17. We note in passing that the question of whether § 20–11–7 totally bars an action under South Dakota law in the absence of the required notice seems to be open. Similarly worded statutes in other states have been interpreted to bar only an award of punitive damages, not the action itself, in the event no notice has been given. *See e.g., Meyerle v. Pioneer Pub. Co.*, 45 N.D. 568, 178 N.W. 792, 795 (1920); *Clementson v. Minnesota Tribune Co.*, 45 Minn. 303, 47 N.W. 781 (1891). We also note that it is unclear whether Newsweek is a "newspaper" within the meaning of § 20–11–7, whether § 20–11–7 requires written or merely oral notice, and whether notice to four of Newsweek's writers and researchers is "notice on the person or persons against whom said action is to be brought" within the meaning of § 20–11–7.

fornia's new governor on Jan. 3, police Sgt. Roy Ennis appeared at the front door of a house in Dixon, Calif., with a South Dakota fugitive warrant for the arrest of Dennis Banks. He was too late. Banks, the 52-year-old leader of the American Indian Movement (AIM), had fled to an Onondago Indian reservation in upstate New York. Once again, he had escaped the clutches of his nemesis, South Dakota Gov. William Janklow, who has pursued him implacably for nearly nine years. Seated on a narrow bed in an Onondaga family's home, where he has taken refuge, Banks recently vowed that he would never surrender to Janklow. "He's anti-Indian—Custer reborn," Banks told *Newsweek* national correspondent Martin Kasindorf.

Banks's escape was the latest chapter in a bizarre test of wills and wiles that began in the early 1970s. At that time, AIM was escalating its efforts to improve the lot of native Americans. In 1972 Banks confronted Julie Nixon Eisenhower at the Republican convention in Miami with a list of demands for Indian housing and education. A few months later, he was on hand when a band of Indians occupied the Bureau of Indian Affairs (BIA) in Washington. In 1973 he was involved in a riot at the Custer, S.D., courthouse during which several policemen were injured. And he helped lead the 71-day takeover of Wounded Knee, S.D.

Along the way, Banks made a dangerous enemy—William Janklow. Their feud started in 1974, when Banks brought charges against Janklow in a tribal court for assault. A 15-year-old Indian girl who babysat for Janklow's children had claimed that he raped her in 1969. Federal officials found insufficient evidence to prosecute, but Banks persuaded the Rosebud Sioux chiefs to reopen the case under tribal law. Janklow, who was running for election as state attorney general at the time refused to appear for the trial. But the tribal court found "probable cause" to believe the charges and barred Janklow from practicing law on the reservation. Eight months later Janklow—who had won his election despite the messy publicity—was prosecut-

ing Banks. And his case—based on the 1973 Custer riot—was successful. Found guilty of riot and assault without intent to kill, Banks jumped bail before sentencing.

The FBI traced Banks to San Francisco in 1976, and Janklow swore out a state fugitive warrant. But Jane Fonda, Marlon Brando and a host of other liberals led a campaign to save him. And Banks's legal representative, activist attorney William Kunstler, collected 1.4 million signatures in a worldwide petition drive to persuade former Gov. Jerry Brown not to comply with the extradition request.

As a compromise, Brown's legal-affairs director offered to jail the fugitive in California for up to 15 years. Banks quickly agreed, but it was not enough for Janklow. "All the little people who followed Dennis Banks that day in Custer faced justice," Janklow says. "One of the key things people like Dennis Banks complain about is the dual standards of justice in this country—and if we allow him to go free because he has friends like Jerry Brown and Marlon Brando, we would be playing right into the accusations of duality." Determined that Banks face justice too, he took his case to the California Supreme Court, which ruled that the matter was entirely Brown's decision. Brown in turn refused extradition after his legal staff warned that Banks's life might be in danger if he returned to South Dakota.

**A New Life:** Safe at last, Banks began a new life as a law-abiding citizen. He taught courses at Stanford, became chancellor of tiny Deganawidah-Quetzalcoatl University in Davis and he became a favorite on the establishment lecture circuit. Janklow, meanwhile, was elected governor of South Dakota in 1978—and picked a public battle with Governor Brown over extradition. At one point, he spread a story that he had offered "prison or California" to 93 convicted felons in his state. "We kind of feel there's a beacon in California," Janklow said. " 'Give us your felons, your pickpockets, your crooked masses yearning to be free'."

The beacon dimmed for Banks last November. Throughout the California gubernatorial race, Deukmejian vowed that if elected he would not continue to shelter Banks. When Deukmejian pulled off an upset victory, Banks's supporters were desperate but still hopeful. They appealed to his Armenian ancestry, hoping to arouse sympathy for oppressed minorities. Their answer came with Sergeant Ennis's warrant.

So far, New York Gov. Mario Cuomo has said nothing. But as soon as Janklow presents Cuomo with an extradition request, Kunstler hopes to work out a deal, either for asylum in New York or a quick return to South Dakota for sentencing and then back to New York to serve a short term. The Onondagas have told Banks that they will try to protect him, but "rather than risk [their] blood," he says, "I would leave." For where? One option is Central America. Another might be to accept Brando's offer of sanctuary on his secluded private island near Tahiti. But Banks has turned that down. "Even though I'm hounded from one end of this country to the other," he says, "I will never abandon it completely."

Connie Leslie with Martin Kasindorf

Newsweek/February 21, 1983

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts I and II of the Court's opinion, and particularly in the holding, *ante* at 649, that "the article in question cannot be read to imply that Newsweek espoused the validity of the rape allegation...." In my view, however, the implication that the plaintiff prosecuted Banks to get revenge for the rape charge is not actionable. It is a statement of opinion about the motives of a public official and should be absolutely privileged under the First Amendment. I therefore dissent from Part III of the Court's opinion and would affirm the judgment of the District Court.[1]

Until today, I had thought that one of the undisputed rights of every American, including the much-discussed "media," was to question the motives of public servants. Such personal criticism may be abusive, and perhaps we would have a better country if there were a lot less of it, but it is, in my opinion, no part of the business of government, including the Judicial Branch, to tell the people that they cannot criticize the motives of their own employees. (Governor Janklow, of course, is not an employee of Newsweek, but the rule announced by this Court would apparently apply equally to a citizen of South Dakota who made the same statement in a coffee shop or during a political campaign.)

It is hard to draw a bright line between "fact" and "opinion." There is a sense in which one's intention or motive in performing a certain act is properly categorized as "fact." Whether someone accused of mail fraud, say, had criminal intent is a question of "fact" to be decided by the jury in a criminal prosecution. Whether someone promising to perform a contract actually had no intention of doing so is a "fact" that, in some jurisdictions, will support a civil action for fraud. And in this sense, whether Governor Janklow prosecuted the case against Banks for revenge, or out of a genuine sense of duty, is a question of "fact." But the term "fact" need not have the same meaning in every legal context. The meaning we give to it should depend on the purposes of the law being applied. Here, that law is the First Amendment, which in the most uncompromising terms ("Congress shall make no law ...") seeks to protect freedom of speech. And certainly speech about government and its officers, about how well or badly they carry out their duties, lies at the very heart of that Amendment.

The District of Columbia Circuit has recently laid out a useful framework for distinguishing "fact" from "opinion" in the context of the First Amendment privilege

---

1. It is accordingly unnecessary for me to reach the issues discussed in Part IV of the Court's opinion, and I express no view on them.

against suits for defamation. *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc). It suggests a number of relevant factors: how precise or indefinite the defendant's statement is; whether the statement is readily verifiable; the literary context in which the statement occurs; and the broader social context into which it fits. On balance, I believe these factors point decisively in the direction of "opinion" in this case.

The statement (that plaintiff "was prosecuting Banks" eight months after the tribal court's unfavorable finding) is not precise. It does not say in so many words that Janklow's motive was revenge. It does not say in so many words that the prosecution was *commenced* after the tribal court's decision. It says only that the prosecution was going on eight months after the tribal court's decision, and no one can deny that that is true. The imputation of improper motive must be drawn from this sentence in the article by implication. The sentence is not nearly so precise as a direct accusation of improper motive. In addition, unlike the Court, I believe this sort of accusation *is* "broad, unfocused, [and] subjective." *Ante* at 652. It will be much more difficult to prove or disprove at trial than whether or not someone is guilty of rape, which was the imputation held actionable in *Cianci v. New Times Publishing Co.,* 639 F.2d 54 (2d Cir.1980), cited by the Court. I shrink from the prospect of a trial at which the jury will be asked to return a verdict on the motives with which a public official did his job.

As for the literary context of the statement, it was, as the Court says, not on the ·Op-Ed page of a newspaper (as was the column at issue in *Ollman*), but it was in a weekly newsmagazine, as opposed to the news columns of a daily newspaper, and I believe most readers would expect a freer expression of personal opinion by writers in that kind of forum. (Indeed, the article as a whole is tendentious and slanted. It is

transparently pro-Banks.) And finally, there is the broader social context, the criticism of the motives and intentions of a public official, a public servant elected to prosecute crime. As I have tried to make clear already, this is a consideration of paramount importance.[2] It is vital to our form of government that press and citizens alike be free to discuss and, if they think fit, impugn the motives of public officials. This is not a case in which the imputed improper motive itself implies a specific crime or act of impropriety, for example, that someone took a bribe. It involves, instead, the kind of general complaint, often expressed in an ill-tempered or ill-considered fashion, that one can hear every day wherever government, state or federal, is discussed.

I am not blind to the fact that this kind of public discussion has its costs. Good people may shrink from public office because of them. Federal judges are no strangers to this sort of attack, and we may often wish to be free of it. But the only restraint that should be imposed on this sort of discussion is self-restraint, either of the individual citizen or of the press itself. The Framers of our Constitution long ago struck the balance in favor of speech, and judges ought not to re-weigh it, however much we might desire to elevate the level of public discourse. In 1786, Thomas Jefferson, writing from Paris in dismay over press attacks on John Jay, said:

> In truth it is afflicting that a man who has past his life in serving the public ... should yet be liable to have his peace of mind so much disturbed by any individual who shall think proper to arraign him in a newspaper. It is however an evil for which there is no remedy. Our liberty depends on the freedom of the press, and that cannot be limited without being lost.

9 Papers of Thomas Jefferson 239 (Boyd ed. 1954).

**2.** In this respect, my views may be closer to those stated in Judge Bork's concurrence in *Ollman,* 750 F.2d at 993, 1004, than to the more

formal factor analysis adopted by Judge Starr's opinion for the Court.

If it was good enough for Thomas Jefferson, it's good enough for me, and I therefore respectfully dissent.