**Mark A. NEHLS, Plaintiff,**

v.

**HILLSDALE COLLEGE, et al., Defendants.**

**No. 00–71483.**

United States District Court, E.D. Michigan, Southern Division.

Nov. 29, 2001.

*OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

FRIEDMAN, District Judge.

## I. *Background*

The plaintiff in this case, Mark Nehls, filed his initial complaint against various defendants, including Hillsdale College alleging defamation, conspiracy to defame, and invasion of privacy. On January 23, 2001 this Court issued an opinion and order granting in part, and denying in part the defendants' motion to dismiss, leaving only the plaintiff's defamation claim against Hillsdale College to go forward. Both parties subsequently filed the present motions—the defendant filed a motion for summary judgment and the plaintiff followed with its own motion for partial summary judgment.

Pursuant to E.D. Mich. LR 7.1(e)(2), the court shall decide these motions without oral argument.

## II. *Facts*

The following are the relevant facts as the Court found them in its January 23, 2001 opinion and order:

Plaintiff was a student at Hillsdale College ("Hillsdale" or the "College") from August 1990 until the fall of 1991 when he was expelled. Plaintiff's problems began in January 1991, when he was appointed as the opinion section editor of the Hillsdale newspaper, *The Hillsdale Collegian*. Plaintiff resigned that position in April 1991, and started his own student newspaper, *The Hillsdale Spectator*. Plaintiff admits that he funded his newspaper by selling advertisements to local businesses during the 1991 spring and fall semesters. Apparently, plaintiff's newspaper was critical of Hillsdale and its administration...

On October 21, 1991, the plaintiff alleges that he was expelled... for the unauthorized use of college facilities and the fraudulent solicitation of advertising to fund his newspaper. *Id.* at ¶ *32*. Plaintiff hired an attorney and appealed the expulsion to Roche, who was then

Hillsdale's president. Roche affirmed plaintiff's expulsion...

...In late 1999, an infamous scandal and tragedy took place at Hillsdale. Roche's daughter-in-law killed herself shortly after revealing that she and Roche had been having an affair together for almost twenty years. The story drew national attention. One article, written by Sam Tanenhaus, was published in the March 2000 edition of *Vanity Fair*, and mentioned plaintiff's name. Plaintiff alleges that on January 6, 2000, Tanenhaus contacted defendant Barrett Kalellis, the College's public relations specialist. Plaintiff alleges that Tanenhaus asked Kalellis about plaintiff and the reason for his expulsion from the school in 1991. Plaintiff alleges that Kalellis...told Tanenhaus that "Mark Nehls misrepresented himself to local businessmen as being from the campus newspaper and collected money from them...this is the reason [he] w[as] expelled." *Compl.*, ¶ 44. The defendants claim that Tanenhaus sent an e-mail to Nehls, asking him if he cared to comment on Kalellis' statement, and that Nehls responded to Tanenhaus and denied the statement's veracity.

The March 2000 *Vanity Fair* article totaled nine pages. Of the nine pages, only the following portion concerned Nehls:

> Not only the faculty was scared. Dissident students...were dealt strong penalties: the sudden loss of a campus job, bullying sessions with administrators, even expulsion, as happened in the case of Mark Nehls, who started his own newspaper, *The Hillsdale Spectator*, financed by ads he sold to local merchants. After clashing with the administration over censorship and other issues, Nehls was thrown out of Hillsdale on charges, which he strongly denies, of having defrauded local businesses by misrepresenting himself as an official of the college.

Opinion and Order, January 23, 2001, pp. 1–4.

The present motions bring to light additional important facts—namely who initiated contact with the press in 2000, how it was initiated, what was said, and for what reasons. Although there is a lot of dispute over who initiated media contact and what was said prior to 2000 any claims regarding those communications are time-barred. *Id.* at 5. The only statement within the statute of limitations is the one Kalellis, the defendant's agent, made in January 2000. *Id.*

In late 1999, eight years after his expulsion but only shortly after Lissa Roche's suicide, the plaintiff contacted the Hillsdale Liberation Organization ("HLO") website. He placed his story about his expulsion on the website, and entitled it "Mark Nehls Speaks." Nehls Depo, 51, 56, 60. The plaintiff consented when the HLO asked him for permission to provide reporters with his phone number and email addresses so that they could contact him to write stories about his Hillsdale experience after reading his account on the HLO website. *Id.* at 81–84. After his story hit the HLO website journalists from *Vanity Fair, Newsweek, Salon Magazine,* and *Weekly Standard* contacted him regarding stories that they were writing about Hillsdale, in light of Lissa Roche's recent suicide. The plaintiff returned the reporters' calls and emails, providing his version of what happened in 1991 regarding his expulsion, and conducted follow-up communications as their stories progressed. *Id.* at 65–67, 133, 135–136; Docs. 102618, 102586, 102726.

One of those reporters was Sam Tanenhaus of *Vanity Fair*. Tanenhaus first learned about plaintiff through the HLO

website. Dft's Exh. 6A. He then contacted HLO, who emailed the plaintiff to ask if they could give Tanenhaus his email address. *Id.* Apparently, he consented, because that same day Tanenhaus emailed the plaintiff to ask if he could speak to him regarding a story he was writing for *Vanity Fair* on Hillsdale. *Id.* A series of email and telephone communications between the two followed. *Id.;* Nehls Depo., 83–84.

During these communications, the plaintiff became involved in the writing of the *Vanity Fair* article and even suggested how certain concepts within the article should be phrased. Doc. 102693. In addition, plaintiff gave Tanenhaus the names of some people "in order to get the College's account" of why he was expelled. Nehls Depo., 95.

On January 6, 2000 Tanenhaus spoke to Barrett Kalellis, Hillsdale's public relations person. The content of that conversation is the subject of the present complaint. Kalellis claims that he provided Tanenhaus with an "off the record" account of the reasons for the plaintiff's expulsion. He further claims that he informed Tanenhaus that the information he had was only from the HLO website, and he would have to get back to Tanenhaus with Hillsdale's official comment. Kalellis later explained,

> When he asked me for that, I didn't really know the college's position on this. I wasn't that familiar with the case. I said I'll make some phone calls to find out.
>
> But at the time I had some very vague familiarity with his expulsion because of this HLO website, which I had very cursory looked at. And what was in the air at the time was, I said, you know, I don't know really, any details about this. I can't speak for the college, but off the record what I surmise is that this kid was trying to fund his alternate newspaper and he made some solicitations to merchants, words to this effect.
>
> But I said, this isn't the college's position. I got to make a couple phone calls and find out, which is what I did subsequently.

Kalellis Depo., 93–95.

That day Tanenhaus, however, summarized Kalellis' January 6 statements into his own words and emailed that summary to the plaintiff, asking him for a response. This email is the basis of the plaintiff's defamation claim.

The text of the email was:

> Frank Maisano, the PR flack from DC has been replaced by a PR man from Detroit, who has been most helpful. I asked him for HC's version of Mark Nehls's expulsion. He reported back as follows: You [Mark] "misrepresented himself to local businessmen" as being from the campus newspaper and collected money from them; the administration warned you to desist but you continued to solicit funds. This is the reason you were expelled. The administration says there was no objection to the Spectator itself.
>
> Comment?

Pltf's Reply, Exh. D, at doc. 102565.

On January 8, 2000 Kalellis sent the official College response. Kalellis testified that he had "no reason to doubt" that the document that the College provided to him to forward to Tanenhaus was the "official college response." Kalellis Dep. at 104. Kalellis passed this response on to Tanenhaus via email. *Id.* at Exh. 8. However, Tanenhaus did not use the official College response in his article, choosing instead to use his summary of Kalellis' January 6 "off the record" statement.

The parties dispute the substance of Kalellis' January 6 statement. Kalellis insists that he made it clear that the statement

was off the record, and that the official response would follow. Tanenhaus claims that "after listening to Mr. Kalellis, I composed, and sent to Mr. Nehls, an email message....I composed this email message and sent it to Mr. Nehls while my conversation with Mr. Kalellis was fresh in my mind, and it reflects my conversation with Mr. Kalellis on January 4, 2000 accurately and correctly." Pltf's Reply, Exh. D. However, neither Tanenhaus' affidavit nor his deposition testimony disputes that Kalellis had made it clear that the statement was "off the record" and that the official statement would follow shortly.

The January 6 email text is very similar to the text of the *Vanity Fair* article, which this Court held was true in its previous Opinion and Order. Opinion and Order at 10. However, as the Court previously held, the difference between the above email and what was actually published in *Vanity Fair* is that the above email was an affirmative statement that the plaintiff misrepresented himself, while the article was only a statement of the reasons for his expulsion, without actually accusing him of any wrongful behavior.

However, the follow-up email two days later with the official college response was a true statement. This email read:

Sam:

I left a message on your voice mail last evening with regard to faxing you this official college statement on the Mark Nehls incident. Since it is rather short, I will copy it here for you.

*Regarding the Expulsion of Hillsdale College student Mark Nehls:* "Freedom of speech, as alleged, was in no way an issue in this matter. Rather, the issue was the act of Mark Nehls, student, entering into an unauthorized contract, following which funds were solicited under false representation of Hillsdale Col-

lege. This was done without College or Student Federation approval.

Eight local businesses were solicited for a substantial sum of funds; these businesses were led to believe that their revenue was going to a Hillsdale College authorized project. Mr. Nehls had been informed earlier that approval of the project was denied by the Student Federation and the administration of Hillsdale College, yet he defiantly proceeded."

That's the substance of the college response. Please feel free to call if you need any additional info.

Pltf's Reply, Exh. D, at doc. 00144.

Both parties agree that the facts of this email are true. Cmplt. ¶¶ 31–32. Mark Nehls did enter "into an unauthorized contract, following which funds were solicited under false representation of Hillsdale College...done without College or Student Federation approval." Pltf's Reply, Exh. D, at doc. 00144.

### III. *Summary Judgment Standard*

The plaintiff argues that Kalellis' January 6, 2000 statement to Tanenhaus constitutes defamation. In response, the defendant argues that the plaintiff made himself a limited purpose public figure by thrusting himself into the forefront of a public controversy. The defendant argues that as a limited purpose public figure the plaintiff must establish by clear and convincing evidence that the defendant made a false and defamatory statement with actual malice, which he has failed to do. Therefore, the defendant argues, his motion for summary judgment should be granted.

The plaintiff's motion for partial summary judgment argues that the statements at issue imply, if they do not actually state, that they plaintiff was expelled for misrepresenting himself to local businesses to get

money from them. The plaintiff believes that the defendant's statements are tortious defamation by implication, or innuendo. Therefore, he argues, partial summary judgment should be granted that the defendants published false and defamatory statements about the plaintiff.

Summary judgment is appropriate when the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In making its determination, the court "must consider all the facts in the light most favorable to the nonmovant and must give the nonmovant the benefit of every reasonable inference." *American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 (6th Cir.1999). In responding to a motion for summary judgment, the nonmoving party cannot simply rest on the mere allegations and denials contained in its pleadings, but must present some specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

## IV. Defendant's Summary Judgment motion

### A. Was the plaintiff a limited purpose public figure?

The defendant cites *Gertz v. Welch* in support of its contention that the plaintiff was a limited purpose public figure. In *Gertz* the Supreme Court defined limited purpose public figures as those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved...they invite attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

*Gertz* establishes a two-pronged analysis to determine if an individual is a limited purpose public figure. First, a "public controversy" must exist. *Id.* at 345, 94 S.Ct. 2997. Second, the nature and extent of the individual's participation in the particular controversy must be ascertained. *Id.* at 352, 94 S.Ct. 2997.

### 1. Did a public controversy exist?

■ The parties dispute the existence of a public controversy. The defendant argues that "the essence of the particular controversy into which Plaintiff thrust himself was this: the status of Hillsdale College and/or the Roche administration as a paragon of the conservative movement and family values VERSUS the alleged reality of Hillsdale/Roche as autocratic, Stalinist, immoral and hypocritical." Dft's Reply, 2. The plaintiff argues that a public controversy did not exist. The plaintiff further argues that if anything, there was public interest not in the theoretical underpinnings of the College, but rather in the adulterous incestuous relationship between the College's former president and his daughter-in-law. The plaintiff then correctly argues that this does not create a public controversy for the purpose of determining if a person is a limited purpose public figure.

A few cases provide guidance about what constitutes a public controversy. The Supreme Court has explained that "dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public." *Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). The Sixth Circuit has not specifically defined a "public controversy." However, the DC Circuit has explained:

As the first step in its inquiry, the court must isolate the public controver-

sy. A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.

*Waldbaum v. Fairchild Publications*, 627 F.2d 1287, 1296 (D.C.Cir.1980)(*citing Time*, 424 U.S. at 454–55, 96 S.Ct. 958).

Similarly, even though the affair between a college president and his daughter-in-law, or the philosophical disagreements regarding a College's teachings "may be of interest to some portion of the reading public," they do not create a "public controversy." Therefore, there is not a public controversy, and the plaintiff is not a limited purpose public figure.

However, if the court were to find that the circumstances surrounding the alleged defamation were a public controversy, the next step would be to analyze whether the plaintiff's involvement in it was sufficient for him to be a limited purpose public figure. As shown below, the plaintiff's role in this controversy was not large enough to find that he was a limited purpose public figure.

### 2. What was the plaintiff's involvement in the public controversy?

■ In order to establish that Plaintiff is a limited purpose public figure, Defendants must show that Plaintiff has:

(1) successfully invited public attention to his views in an effort to influence others *prior to the incident that is the subject of the litigation;*

(2) voluntarily injected himself into a public controversy related to the subject of the litigation;

(3) *assumed a position of prominence in the public controversy;* and

(4) maintained regular and continuing access to the media.

*Pesta v. CBS, Inc.,* 686 F.Supp. 166, 169 (E.D.Mich.1988) *quoting Lerman v. Flynt Distributing Co., Inc.,* 745 F.2d 123, 136–37 (2d Cir.1984) (*emphasis added by court*).

■ The defendant has proven all of the elements but the third. First, there is no doubt that the plaintiff invited public attention to his views by putting his story on the HLO website, maintaining regular correspondence with journalists, and even going so far as to offer to help phrase a sentence within the *Vanity Fair* piece. Second, the plaintiff also voluntarily injected himself into a public controversy related to the subject of the litigation by offering regularly to discuss "his side" of the story as well as other things that he felt journalists may like to know about the College. Fourth, the plaintiff maintained regular and continuing access to the media, as evidenced by the numerous email correspondences with various journalists that are attached to both parties' briefs.

The third element, however, prevents his status as a limited purpose public figure. The plaintiff never assumed a position of prominence in the public controversy. His position within the public controversy occupied a short blurb in a nine page article. The defendant cannot successfully argue that this was a "position of prominence," for which the plaintiff should be determined a limited purpose public figure.

For that reason, the defendant's argument that the plaintiff was a limited purpose public figure must fail. Therefore,

the defendant's further argument that actual malice must be found in order for the plaintiff to recover for defamation is moot.

Next, his claim must be analyzed as a private plaintiff.

## B. Plaintiff's defamation claim

■ "A court may determine, as a matter of law, whether a statement is actually capable of a defamatory meaning. Where no such meaning is possible, summary disposition is appropriate." *Kevorkian v. American Medical Association*, 237 Mich. App. 1, 9, 602 N.W.2d 233 (1999). Both of the parties have focused extensively on the limited purpose public figure issue, and neither have discussed whether summary judgment should be granted if the defamation claim were analyzed regarding the plaintiff as a private person. This is the next natural step, and the court will next determine whether the statement at issue is capable of a defamatory meaning.

■ "A communication is defamatory if, under all the circumstances, it tends to so harm the reputation of an individual that it lowers the individual's reputation in the community or deters others from associating or dealing with the individual." *Kefgen v. Davidson*, 241 Mich.App. 611, 617, 617 N.W.2d 351 (2000). The plaintiff has not alleged any damages regarding the January 6 statement. He has not alleged that his reputation in the community was lowered, that he suffered any sort of personal or professional damage, or that the statement has resulted in any monetary loss. In fact, this would be impossible for the plaintiff to establish, as the January 6 statement was never publicized, and the Court found the only publication, the *Vanity Fair* article, to be true. Opinion and Order at 10. Therefore, the January 6 statement is not defamatory because it has not "so harm[ed] the reputation of the [plaintiff] that it lower[ed] the [plaintiff's]

reputation in the community or deter[red] others from associating or dealing with the [plaintiff]." *Id.*

However, even if the plaintiff alleged that the statement damaged his reputation, it does not amount to defamation. Michigan courts have developed a four-part test to make this determination.

■ Generally, a plaintiff may establish a claim of defamation by showing:

(1) a false and defamatory statement concerning the plaintiff;

(2) an unprivileged publication to a third party;

(3) fault amounting at least to negligence on the part of the publisher; and

(4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod).

*Id.*

■■ The plaintiff's claim cannot survive this test. Even if a court determines that a statement is defamatory, "not all defamatory statements are actionable." *Kevorkian*, 237 Mich.App. at 5, 602 N.W.2d 233. The Supreme Court has protected statements that, although factual on their face and provable as false, could not reasonably be interpreted as stating actual facts about the plaintiff. *Id.* at 6, 602 N.W.2d 233, *citing Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16–17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). In addition, the Supreme Court has recognized that statements must be viewed in context to determine whether they are capable of defamatory interpretation, or whether they constitute no more than "rhetorical hyperbole" or "vigorous epithet." *Id.* "Exaggerated language used to express opinion, such as 'blackmailer,' 'traitor' or 'crook,' does not become actionable merely because it could be taken out of context as accusing someone of a crime. Into this

category, we would place statements that are both necessarily subjective and objectively verifiable, and statements that both do and do not state actual facts about a person." *Id.* at 8, 602 N.W.2d 233. Similarly, the statement at issue is not capable of a defamatory meaning.

■■■ If a jury were to find that the January 6 statement was "off the record" by someone who "wasn't that familiar with the case" as the defense claims, then it could not be reasonably interpreted as stating actual facts about the plaintiff. However, construing the context in the light most favorable to the plaintiff, even if a jury found that the January 6 statement was not "off the record," the official College statement two days later negates any inference that it stated actual facts. In addition, the fact that Tanenhaus chose not to use the January 6 statement in his *Vanity Fair* article indicates that he, as a reasonable person, did not interpret the January 6 statement as fact. Therefore, regardless of a jury's findings, the statement cannot be interpreted as stating actual facts and is not capable of a defamatory interpretation. Therefore, the defendant's summary judgment motion should be granted.

### V. Plaintiff's motion for partial summary judgment

Because the defendant's summary judgment motion is granted in its entirety, the plaintiff's motion for partial summary judgment is denied as moot.

Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment is granted.

IT IS FURTHER ORDERED that the plaintiff's motion for partial summary judgment is denied.