Harry F. BELL, Sr., Plaintiff,

v.

The NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, a political committee organized pursuant to 26 U.S.C.A. 527, Defendant.

No. Civ.A. 2:00–0982.

United States District Court,
S.D. West Virginia,
Charleston Division.

Feb. 21, 2002.

Rudolph L. DiTrapano, DiTrapano, Barrett & Dipiero, PLLC, Charleston, WV, for plaintiff.

Michael W. Carey, Carey, Scott & Douglas, PLLC, Charleston, WV, for defendant, National Republican Congressional Committee.

Bobby R. Burchfield, Jason A. Levine, Richard W. Smith, Covington & Burling, Washington, D.C., for defendant, National Republican Congressional Committee.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Now pending is defendant National Republican Congressional Committee's motion for summary judgment. For reasons discussed herein, the motion is **DENIED.**

## I. Background

This suit concerns statements allegedly implying that Harry Bell is a repeat sex offender and rapist. It arises in the context of the race for West Virginia's second district congressional seat in 2000. James Humphreys was the Democratic candidate. Harry Bell was Humphrey's former neighbor and agreed to appear in a television advertisement for Humphreys. The ad was taped in Bell's house, and Bell spoke the line "We want the right to choose our own doctors." The ad was aired across the second district in the spring of 2000. Later in the campaign, Bell and his wife agreed to pose with Humphreys for campaign photographs at a local drug store. One photograph depicting Humphreys, Bell, and Bell's wife appeared in four Humphreys campaign pamphlets and on the Humphreys web site. The photograph showed Bell and his wife standing in front of a drug store shelf, listening to Humphreys speak. Bell consented to the campaign's use of the television advertisement and the drug-store photos.

In mid-October 2000, the National Republican Congressional Committee (NRCC) commissioned and mailed a political pamphlet commenting on Humphrey's record as a lawyer and West Virginia state legislator. One page of the pamphlet featured a version of the Humphreys–Bell photograph, downloaded from Humphreys' web site, from which Mrs. Bell had been cropped. The cropped photograph appeared immediately adjacent to the bold text, "Humphreys Defended Sex Offenders as a Criminal Defense Lawyer," and the caption, "A multi-millionaire trial lawyer, Jim Humphreys has represented rapists and repeat child molesters." The pamphlet did not identify Bell.

Bell filed this suit, asserting claims of libel per se, invasion of privacy, and intentional infliction of emotional distress. After the case began, Bell gave interviews with local news media in which he discussed the pamphlet and his suit.

## II. Discussion

### A. Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to

the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

**B. Defamation and Invasion of Privacy Claims**

■ For Bell to prevail on his defamation claim, he must show that the pamphlet was defamatory and that it referred to him. *Crump v. Beckley Newspapers, Inc.*, 173 W.Va. 699, 320 S.E.2d 70, 77 (1984). On the invasion of privacy claim, he must show that the pamphlet placed him in a false light. *Id.* at 86. In performing its analyses, the court is cognizant that the pamphlet appeared in connection with a political campaign. Free speech protections are especially important in this context because elections are manifest democracy.

It is the informed participation of everyday citizens that sustains our democracy. The framers recognized that open debate leads to the discovery and spread of political truth and. that citizens who have the opportunity to express themselves help soothe the inherent unrest in a society. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). They recognized that obstacles to such debate and expression threaten to destabilize government and provided significant protections for political speech, placing it at the core of the First Amendment. *Id.* "The greatest menace to freedom is an inert people." *Whitney*, 274 U.S. at 375, 47 S.Ct. 641.

■ It has long been recognized, however, that not all speech is of equal First Amendment importance. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Speech on matters of public concern lies at the heart of the First Amendment's protections. *Id.* But speech on matters of purely private concern is of less First Amendment concern, and therefore warrants less protection. *Id.* Balancing First Amendment concerns and the state's interest in providing redress for injury to reputation results in differing levels of protection for public and private figures. *Id.* To encourage active participation, the law makes it difficult for public figures, such as political candidates, to prevail in defamation suits. Requiring them to prove that a defendant acted with actual malice encourages people to comment freely on high-profile figures—who have invited attention and comment and assumed some risk of injury from defamation—without fear of liability for accidentally defamatory statements. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (citations omitted). On the other hand, private individuals—who have not invited public comment and are not integral to the discussion—may prevail upon a lesser showing. *Id.* at

342, 347, 94 S.Ct. 2997. This case requires the court to determine whether Bell was a public or private figure in the context of a congressional election.

During an election, citizens engage in public discussion by pinning buttons on lapels, sticking campaign signs in yards, gluing bumper stickers on cars, and speaking out at town hall meetings. Through these and similar acts, citizens invite their neighbors to discuss political and social reform. Their stated or displayed political preference often provokes further discussion. Given the often contentious nature of political campaigns and the hunger of the media for the slightest whiff of scandal, it is hardly surprising that many citizens are repelled by the process and choose not to participate. Fortunately, others recognize the structural importance of citizen engagement in the public debate which is an election campaign.

Here, Bell marginally participated in such a debate by showing support for Humphreys. He spoke one line in a television ad and posed for campaign photos. Bell did not actively campaign for Humphreys. Bell Dep. at 38. He appeared in the ads only as a "neighborly gesture," and had no particular interest in the issues being discussed. *Id.* at 30, 33, 37–38. He chose his line solely because it was short. *Id.* at 30. He did not talk with the media, write editorials or letters to the editor, give press releases, or speak out at public rallies about his support for Humphreys. The Humphreys ads, pamphlets, and web site never identified him.[1] In short, Bell simply became peripherally involved, as was his right and civic duty, in the election process. It was this involvement which lead to the NRCC's use of his photo in its pamphlet. The pamphlet is the subject of

this suit, and the court must determine how much protection is due it.

### 1. Limited–Purpose Public Figure Doctrine

■ Both defamation and invasion of privacy are common law torts. Analysis of each requires the court to determine whether Bell is a limited-purpose public figure or a private individual. Since *Gertz,* lower courts have developed differing approaches to the limited-purpose public figure doctrine. *See generally* Nat Stern, *Unresolved Antitheses of the Limited Public Figure Doctrine,* 33 Hous.L.Rev. 1027 (1996). In West Virginia, a plaintiff is a limited-purpose public figure if the defendant proves 1) that the plaintiff voluntarily engaged in significant efforts to influence a public debate or voluntarily assumed a position that would propel him to the forefront of a public debate on a matter of public concern; 2) that the public debate or controversy and the plaintiff's involvement in it existed prior to the publication of the allegedly libelous statement; and 3) that the plaintiff had reasonable access to channels of communication that would permit him to make an effective response to the defamatory statement in question. *Suriano v. Gaughan,* 198 W.Va. 339, 480 S.E.2d 548, 557–58 (1996).

■ In determining Bell's status, the court conducts a three-part inquiry. *See Suriano,* 480 S.E.2d at 558–61. First, it identifies the public controversy in which Bell was involved and determines whether it existed before the allegedly defamatory statement was made. *Id.* at 558. It next examines Bell's role in that controversy and determines whether his participation sufficed to establish him as a public figure within the context of that controversy. *Id.* at 558–59. Finally, it determines whether

---

1. Indeed, the NRCC admits it did not know who Bell was when it downloaded the photo and published the pamphlet. McGahn Dep. at 108.

Bell had reasonable access to channels of communication. *Id.* at 560. The emphasis of the inquiry is on the two rationales identified in *Gertz:* public figures, unlike private figures, have voluntarily waived their private status and have ready outlets to respond to attacks. *Id.* at 557.

### a. Public Controversy

The court finds that the allegedly defamatory statement occurred within the context of a campaign, which was a controversy for the purposes of the *Suriano* test.[2] An election is clearly a matter of public concern and controversy. "One is hard-pressed to identify an event more public in nature—and more essential to a free society—than an election of public officials." *Martin v. Griffin,* 2000 WL 872464 (Conn.Super.2000). The congressional race was debated publicly and had foreseeable and substantial ramifications for nonparticipants. *Suriano,* 480 S.E.2d at 558 (quoting *Waldbaum v. Fairchild Pubs., Inc.,* 627 F.2d 1287, 1297 (D.D.C. 1980)). The Humphreys campaign was therefore a public controversy in existence before publication of the NRCC's pamphlet.

### b. Plaintiff's Role in the Controversy

The next question is whether Bell's involvement in the campaign rises to the level of "significant efforts to influence a public debate" or, stated another way, whether appearing in the ad and photos was "assum[ing] a position that would propel him to the forefront of" the campaign. *Suriano,* 480 S.E.2d at 557. Bell's involvement was limited to speaking one line in a Humphreys television ad and posing with Humphreys for photographs. The court finds that these efforts were not "significant," nor was Bell at the forefront of the campaign. *See Suriano,* 480 S.E.2d at 557.

Limited-purpose public figures usually have a much greater degree of involvement than Bell did here. For example, in *Suriano,* the plaintiff was "aggressively involved" with a debate over changes to the public health care insurance program. *Id.* at 558. He had written at least 50 letters to newspapers, organizations, and government officials around the state arguing for his point of view. *Id.* at 558–59. In *Carr v. Forbes, Inc.,* the limited-purpose public figure plaintiff had voluntarily assumed a prominent public presence in the development of a sewer project. 259 F.3d 273, 281 (4th Cir.2001). He attended public meetings, spoke out in favor of the project, wrote editorials for local papers, and was quoted in the media. *Id.* Indeed "his acts created much of the controversy." *Id.* In *Gray v. St. Martin's Press, Inc.,* the First Circuit upheld the district court's classification of lobbyist Robert K. Gray as a limited-purpose public figure, noting that he was "one of the best-known of the high-level Washington public relations experts, an emblematic figure, and a self-professed defender against attacks on lobbying." 221 F.3d 243, 251 (1st Cir.2000).

Where plaintiffs are less involved in the controversy, courts find that they were private individuals. For example, in *Hutchinson v. Proxmire,* the Supreme Court found that a scientist who published

---

**2.** The matter of public concern here is the election, not, as plaintiff suggests, the issues raised by the NRCC pamphlet. That controversy existed before and after publication of the allegedly defamatory statement. *See Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (finding that the controversy must exist before publication of the defamatory statements); *Fitzgerald v. Penthouse Int'l., Ltd.,* 691 F.2d 666, 669 (4th Cir.1982) (looking to the controversy as it existed before the defamatory statements).

his research and applied for federal funds had not assumed a role of public prominence and was therefore a private figure. 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). In *Gertz,* the Court concluded that publishing books and articles on legal issues and being active in local community affairs did not make the plaintiff a public figure. *Gertz,* 418 U.S. at 351–52, 94 S.Ct. 2997. In *Nehls v. Hillsdale College,* the plaintiff talked with and wrote to various journalists, including a *Vanity Fair* reporter, and posted a statement on the Internet. 178 F.Supp.2d 771 (E.D.Mich.2001). The court found that he had voluntarily injected himself into the public controversy, but noted that plaintiff's "position within the public controversy occupied a short blurb in a nine page article." *Id.* at 778. The court found that this limited involvement did not constitute a position of prominence and held that he was a private individual. *Id.*

■ Here, Bell was a volunteer in the Humphreys campaign. Simple involvement with a matter of public controversy, however, is not enough to establish one as a public figure. *See Wolston v. Reader's Digest Assoc., Inc.,* 443 U.S. 157, 167, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). One rises to limited-purpose public figure status only if one thrusts oneself into the "vortex of the issue." *Gertz,* 418 U.S. at 352, 94 S.Ct. 2997. Candidates are at the center of the political campaigns which swirl around them. A volunteer posing for campaign photos and speaking one line in a TV spot is hardly positioning himself at the forefront of the campaign. *Id.* Bell did not seek or achieve any position of great importance in the campaign. He neither sought nor had any responsibilities in the campaign. He certainly cannot be said to have had "a major impact on the resolution of a specific public dispute." *Suriano,* 480 S.E.2d at 557 (citations omitted).

If casting a vote is the most basic political duty of a good citizen, then expressing support for a candidate may be his most basic personal right. His expression may touch on public concerns and may be intended to affect public opinion, but a common citizen's political speech does not thrust him into the public limelight and subject him to the same torrent of criticism that the candidates themselves must bear. Political speech is a common right commonly exercised, and the limelight is so diffused as to only rarely shine upon a given speaker. The campaign volunteer is not in the spotlight illuminating public figures.

Nevertheless, the defendant argues that Bell is a limited-purpose public figure. The court disagrees. Legal recognition that such minimal engagement in a political campaign makes one a limited-purpose public figure for purposes of a defamation analysis would serve to chill citizen participation in the political process and further the lamentable trend toward public passivity. Citizens need not weigh the value of participating in the electoral process against the risk of being libeled.

### c. Access to Channels of Communication

Finally, the court turns to the third prong of the *Suriano* test and determines whether Bell had reasonable access to channels of communication. *See Suriano,* 480 S.E.2d at 558. Bell spoke to the media on several occasions following publication of the NRCC pamphlet. According to the defendant, this activity demonstrates that Bell had access to channels of communication, thus fulfilling the third prong. However, the Fourth Circuit has held "that a person who has been publicly accused of committing an act of serious sexual misconduct that (if committed in the place of publication and proved beyond a

reasonable doubt) would be punishable by imprisonment cannot be deemed a 'limited-purpose public figure' merely because he or she makes reasonable public replies to those accusations." *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1558 (4th Cir.1994). Therefore, if Bell's public comments following the pamphlet were predominantly reasonable replies to accusations of rape and child molestation, his access to channels of communications would not meet the third prong of *Suriano. Id.*

For example, in *Foretich,* the plaintiffs and their son had been publicly accused of molesting their granddaughter. *Id.* at 1543. They gave interviews with national news media in which they talked about themselves and their son. *Id.* at 1545–49. Applying general principles of the common law on the privilege to speak in self-defense or to defend one's reputation, the court looked to whether the Foretiches' public comments and appearances were responsive to the attacks; proportionate to the attacks; and not excessively published. *Id.* at 1559–60. This analysis enabled the court to determine whether the plaintiffs' public appearances were reasonable replies to the accusations, or efforts to assume special roles of prominence. *Id.* The court then determined that the test was satisfied and the Foretiches' public comments did not remove them from the private individual category. *Id.* at 1563.

West Virginia has adopted the *Foretich* approach to evaluating reasonable access to channels of communication, except that a defendant need not show that plaintiff assumed a role of special prominence in the public controversy. *See Suriano,* 480 S.E.2d at 558 n. 13 ("As we see it, prominence is certainly relevant to the determination of whether the plaintiff had access to communication channels—the greater one's prominence, the greater one's ac-

cess—but we do not believe it is essential to securing an opportunity to make an effective response."). Accordingly, the court will apply the *Foretich* test with special emphasis on the forum in which the allegedly defamatory statement occurred. *Id.* at 560.

First, the court finds that Bell's public appearances were responsive. Statements that deny the accusations, express one's impressions upon first hearing, or impugn the motives of the accuser are responsive. *See Foretich,* 37 F.3d at 1560. Here, in local newspaper and television interviews following the pamphlet's distribution, Bell and his former lawyers criticized the pamphlets, reiterated the claims made in the complaint, denied that Bell was a sex offender or had ever been arrested, reported Bell's feelings upon seeing the pamphlet, and called the mailing a malicious and irresponsible act. Pl. Ex 12–15. It does not appear that Bell's response said more than was necessary to protect his reputation or exceeded the scope of the attack.

The court also finds that Bell's response was proportional. In *Foretich,* the court noted that because the allegations of sexual abuse are particularly serious, "a reply would have to be truly outrageous before we would deem it 'altogether disproportionate to the occasion.'" *Id.* at 1562 (quoting *Montgomery Ward & Co. v. Watson,* 55 F.2d 184, 188 (4th Cir.1932)). Honest indignation, strong words, colorful verbiage, hyperbole, and exaggerated statements of fact are all permissible as self-defense. *Id.* Excessive enthusiasm or expressions of malice, however, are considered unreasonable. *Id.* Bell's lawyers described the pamphlet as the reckless, irresponsible, malicious act of right-wing zealots. Some of these remarks are strong, but viewed in light of the alleged assault on Bell's character, the court can-

not find they were excessive or disproportionate. *See id.*

Finally, the court finds that Bell's replies were not excessively published. This prong of the test requires the reply to reasonably focus on the audience which heard the attack. Where an attack is widespread, so too may be the response. *Foretich*, 37 F.3d at 1563. The NRCC pamphlet was mailed to nearly 75,000 West Virginians across the state. Bell's response appeared in local newspapers and on local television stations in Charleston. Considering the large size of the NRCC pamphlet audience, Bell's response was reasonably focused.

The court also notes that Bell does not appear to have had access to channels of communication before the publication of the NRCC pamphlet. Before the pamphlet appeared, he was a retired engineer leading an anonymous life. His appearance in Humphrey ads did not change this anonymity. It was only the alleged defamation that created access to channels of communication. Thus, he "did not have the regular and continuing access to the media that is one of the accouterments of having become a public figure." *Hutchinson*, 443 U.S. at 136, 99 S.Ct. 2675. Therefore, the court holds that Bell is a private figure and will proceed to evaluate his claims with that classification in mind.

### 2. Libel Per Se

 A statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Crump v. Beckley Newspapers, Inc.*, 173 W.Va. 699, 320 S.E.2d 70, 77 (1984). Because Bell is a private figure, he must prove the following essential elements to prevail on his defamation claim; 1) defamatory statements; 2) a nonprivileged communication to a third party; 3) falsity; 4) reference to the plaintiff; 5) at least negligence on the part of the publisher; and 6) resulting injury. *Id.* Neither party disputes that communication was made to a third party, or that Bell is not a sex offender.

 First, the court must decide as a matter of law whether the challenged statements are capable of a defamatory meaning. *Dixon v. Ogden Newspapers, Inc.*, 187 W.Va. 120, 416 S.E.2d 237, 241 (1992). The defendant argues that Bell has not met his burden because the NRCC did not intend for the pamphlet to refer to him. Proving intent, however, is not necessary to showing that a statement is capable of defamatory meaning. *See Crump*, 320 S.E.2d at 77 ("[A]t least negligence on the part of the publisher" is required). The defendant also argues that Bell has not proven the first element because he has failed "to find anyone who shared his interpretation of the pamphlet." This is irrelevant to determining whether the statement is capable of defamatory meaning. Plaintiff need prove only the element of publication; if he has shown that the statement was made to a third person, and that the statement is defamatory, harm to reputation is presumed. *See Crain v. Lightner*, 178 W.Va. 765, 364 S.E.2d 778, 785 (1987).

 The NRCC argues that "in no respect whatsoever" is it reasonable to conclude that the pamphlet's text referred to Bell. Reply Mem. at 7. In determining whether the pamphlet is capable of defamatory meaning, the court assesses whether the text and picture imply an assertion that Bell is a sex offender. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (assessing clear impact, general tenor and impression and finding that a newspaper headline was capable of defamatory meaning). Courts assess the meaning of an allegedly libelous

statement from the perspective of a reasonable reader. *McKimm v. Ohio Elections Comm'n.*, 89 Ohio St.3d 139, 729 N.E.2d 364, 370–71 (2000) (relying on *Milkovich*, 497 U.S. at 21, 110 S.Ct. 2695 and *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 513, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)).

■ In determining the reasonableness of a recipient's understanding, meaning is to be given to words which is normally attached to them by ordinary people. *Restatement (Second) of Torts* § 563 cmt. c (1977). "The defamatory imputation may be made by innuendo, by figure of speech, by expressions of belief, by allusion, or by irony or satire." *Id; Crump*, 320 S.E.2d at 77. In assessing a communication, words are to be taken in context. *Restatement (Second) of Torts* § 563 cmt. c. "The context of a defamatory imputation includes all parts of the communication that are ordinarily heard or read with it." *Id.* Libel can therefore include defamation through the publication of photographs. *Crump*, 320 S.E.2d at 80 (citing *Wandt v. Hearst's Chicago Amer.*, 129 Wis. 419, 109 N.W. 70, 70 (1906) (holding that the juxtaposition of plaintiff's photograph with an article accusing a third person of being a "suicide fiend" was a statement that the plaintiff was a suicide fiend); *see also Peck v. Tribune Co.*, 214 U.S. 185, 188, 29 S.Ct. 554, 53 L.Ed. 960, (1909)). In *Crump*, the plaintiff's photograph accompanied an article about problems faced by women miners. *Id.* at 75. The article discussed one incident in which the women miners were stripped, greased, and sent out of the mine as part of an initiation rite. *Id.* The court concluded that plaintiff's allegations of defamation were sufficient to raise a genuine issue of material fact for the jury. *Id.* at 80.

Here, the pamphlet's headline "Humphrey's Defended Sex Offenders" must be taken in context with the adjacent photograph depicting Humphreys standing next to an unidentified man. The court finds that a reasonable reader could conclude that the headline and the picture implied that Bell is a sex offender. Therefore, the court finds that the pamphlet is capable of defamatory meaning. Whether it actually was defamatory is a question for the jury.

■ The court finds that Bell has produced enough evidence to create a material issue of fact as to whether the NRCC was negligent in distributing the pamphlet. He has shown that the NRCC neither knew who Bell was nor attempted to ascertain his identity before using his photo adjacent to text about child molesters and repeat rapists. McGahn Dep. at 108, 113. It was aware of the availability of pictures depicting only Humphreys, yet selected a photo showing an unidentified man and woman. *Id.* at 111. Finally, it is noteworthy that the original downloaded photograph showed three individuals—Humphreys, ·Bell, ·and his wife. The NRCC cropped Mrs. Bell from the photo but purposely left Bell in it. The court believes there is a genuine issue of material fact as to whether these actions constitute negligence.

■ Finally, the court turns to the issue of injury. Where the statements are libelous per se, damages are presumed. *See Milan v. Long*, 78 W.Va. 102, 88 S.E. 618, 620 (1916); 50 *Am.Jur.2d* Libel and Slander § 146 (1995). Statements imputing serious sexual misconduct are defamatory per se because they are so obviously and materially harmful to·reputational interests. *See Foretich*, 37 F.3d at 1558. Bell thus meets the last element of the tort of defamation. The court finds that, viewed in the light most favorable to Bell, he has produced enough evidence to survive summary judgment on this count.

### 3. Invasion of Privacy

West Virginia recognizes false light invasion of privacy. *See Crump,* 320 S.E.2d at 85. Defendant argues that because of Bell's voluntary political activities, he had no reasonable expectation of privacy with respect to his photographs. Defendant misinterprets the law on false light. A plaintiff states a claim for false light invasion of privacy when he demonstrates publicity which places him in a false light before the public. *Id.* at 86. For example, using another's photograph as an illustration for an article or book with which that person has no reasonable connection, and which places the person in a false light, is actionable as an invasion of privacy. *Id.* (citing *Leverton v. Curtis Pub. Co.,* 192 F.2d 974, 977 (3d Cir.1951) (finding false light invasion of privacy where the *Saturday Evening Post* published a photo of a child who was nearly struck by a car next to an article about pedestrian carelessness in the role of accidents); *Peay v. Curtis Pub. Co.,* 78 F.Supp. 305, 306 (D.D.C.1948) (finding false light where photo of honest taxi driver accompanied article about dishonest ones); *Gill v. Curtis Pub.,* 38 Cal.2d 273, 239 P.2d 630, 633 (1952) (finding false light where a photo of an affectionate couple was used to illustrate an article about how love at first sight was founded on sexual attraction and would be followed by divorce)).

To prevail on this claim, Bell must show that the matter was untrue and highly offensive to a reasonable person. *Crump,* 320 S.E.2d at 87. He also must demonstrate that there was widespread publicity of the item. *Id.* Because he is a private figure, he need only prove that the NRCC was negligent in publishing the statement. *Id.* at 90. If a legitimate matter of public interest is involved, he must prove knowledge of falsity or reckless disregard for the truth. *Id.* This privilege is applicable only where a logical nexus exists between the plaintiff and the matter of public interest. *See Campbell v. Seabury Press,* 614 F.2d 395, 397 (5th Cir.1980); *see also Vassiliades v. Garfinckel's, Brooks Brothers,* 492 A.2d 580, 589–90 (D.C.Ct. App.1985).

Here, the campaign in general, and Humphreys' qualifications as a candidate in particular, were certainly matters of legitimate public interest. There is no nexus, however, between Bell and Humphreys' representation of sex offenders. Publication of Bell's photo adds nothing to the discussion of Humphreys' candidacy. *See Vassiliades,* 492 A.2d at 589–90. The public's awareness of the issues raised by the NRCC pamphlet were not enhanced in any way by the inclusion of Bell. The court therefore finds that no nexus exists between the NRCC's statements and Bell's inclusion in the photograph, and that the public interest privilege is not applicable. *See Campbell,* 614 F.2d at 397; *Vassiliades,* 492 A.2d. at 590.

Because the public interest privilege is not applicable, Bell can prevail if he demonstrates that the NRCC was negligent in publishing the pamphlet. *See Crump,* 320 S.E.2d at 88. As the court found in its defamation analysis, Bell has clearly produced enough evidence for a reasonable fact finder to conclude that the NRCC was negligent. Therefore, summary judgment on this claim must be denied.

### C. Intentional Infliction of Emotional Distress Claim

West Virginia recognizes the separate tort of intentional infliction of emotional distress. *See Travis v. Alcon Labs., Inc.,* 202 W.Va. 369, 504 S.E.2d 419, 424 (1998). This tort, unlike defamation and invasion of privacy, requires more

than negligence. Bell must show either that the NRCC acted with intent to inflict emotional distress on him or was substantially certain its conduct would have that result. *Id.* at 425. The court finds that Bell has produced enough evidence that the NRCC acted recklessly. While the NRCC points out that it did not intend for the headline to refer to Bell, or for the pamphlet to injure his reputation, Bell has shown that the NRCC placed a loaded headline immediately next to a picture depicting Humphreys and Bell after deliberately cropping Mrs. Bell from the photo. The court has already found that a reasonable reader could view the pamphlet as a statement that Bell is a sex offender. Therefore, a reasonable juror could conclude that the NRCC foresaw this implication and that Bell would be emotionally distressed by its publication.

Bell also must demonstrate a high degree of outrageousness. *See Hines v. Hills Dept. Stores, Inc.,* 193 W.Va. 91, 454 S.E.2d 385, 390 (1995). The court finds that being labeled a child molester and rapist may reasonably be considered outrageous. Whether it is in fact outrageous is a question for the jurors. *See Travis,* 504 S.E.2d at 428. Furthermore, Bell has demonstrated that he was distressed by the implications in the pamphlet. The intensity of this distress is another question for the fact finder. *Id.* at 430 (citing *Restatement (Second) of Torts* § 46 cmt. j (1965)). Accordingly, summary judgment on this claim is denied.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party and to publish the same on the court's website at www.wvsd.uscourts.gov.