UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-1136

KIM TOMBLIN,

Plaintiff - Appellant,

v.

WCHS-TV8,

Defendant - Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, District Judge. (3:08-cv-01294)

Argued: January 27, 2011                    Decided: May 11, 2011

Before NIEMEYER, DAVIS, and KEENAN, Circuit Judges.

Vacated and remanded by unpublished opinion. Judge Niemeyer wrote the majority opinion, in which Judge Keenan joined. Judge Davis wrote a dissenting opinion.

**ARGUED**: Jay Carter Love, Sr., JAY LOVE LAW OFFICE, Huntington, West Virginia, for Appellant. Richard M. Goehler, FROST BROWN TODD, LLC, Cincinnati, Ohio, for Appellee. **ON BRIEF**: Patricia A. Foster, FROST BROWN TODD, LLC, Cincinnati, Ohio; Jared M. Tully, FROST BROWN TODD, LLC, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

After WCHS-TV8 in Charleston, West Virginia, broadcast a news report that a four-year-old child was sexually abused at Kim's Kids Daycare in Barboursville, West Virginia, Kim Tomblin, the owner of the daycare, commenced this action for defamation and related torts. On WCHS-TV8's motion, the district court entered summary judgment in favor of the television station (actually Sinclair Media III, Inc., the station's owner), concluding that the station accurately reported the abuse allegations made by the mother of the child.

After review of the record, including a copy of the broadcast in question, we conclude that there are genuine issues of material fact as to Tomblin's claims. By reporting that the daycare was alleged to have abused a child, the television station may have published a false statement inasmuch as it knew and left out the fact that the incident involved one four-year-old boy touching the rectum and genitalia of another four-year-old boy. Accordingly, we vacate the summary judgment and remand to the district court for further proceedings. We also affirm in part and reverse in part two evidentiary rulings made by the district court.

On June 10, 2008, the mother of a four-year-old boy submitted a complaint to the West Virginia Department of Health and Human Resources ("DHHR") that while her son was attending Kim's Kids Daycare, another four-year-old boy stuck his finger in her son's rectum and grabbed his genitals. Kim's Kids Daycare was a state-licensed daycare operated by Kim Tomblin, her husband, and a staff of approximately six employees. Some two to three dozen children between the ages of two and five regularly attended the daycare.

The DHHR investigated the complaint and was unable to corroborate the charge. It issued a report on June 26, 2008, indicating that "Child neglect ha[d] not occurred." The report did indicate, however, that twice previously the daycare was cited for inadequate supervision of the children (in 2006 and in 2007) and that "the possibility that an incident [of child neglect] could occur is likely." The report also indicated that staff members were observed smoking, for which the daycare had, in 2003, also been previously cited. The DHHR provided a copy of its report to the mother.

On July 1, 2008, when Kim's Kids Daycare's license came up for renewal, the DHHR informed Tomblin that the license would not be renewed, based on past violations. Tomblin appealed the

decision, and, pending appeal, Tomblin was authorized to continue operating the daycare.

About three weeks after receiving a copy of the report, the mother of the four-year-old boy who had been inappropriately touched called WCHS-TV8, a local television station in Charleston, to report that her child "was sexually abused while at Kim's Kids Daycare." WCHS-TV8 assigned reporter Elizabeth Noreika to investigate the allegations. After speaking with John Law, a DHHR official who told Noreika that an investigation was ongoing and an appeal was pending with respect to the non-renewal of Tomblin's license, Noreika interviewed the mother, who told Noreika that "while at the daycare her child had been sexually abused." The mother provided Noreika with a copy of the DHHR report, which Noreika read in its entirety. The report provided the details of the charge: "A boy at Kim's Kids Day Care touched [a four-year-old boy] inappropriately by sticking his finger in his rectum and grabbing his genitals. [The four-year-old boy] is now displaying these behaviors." The report then summarized the investigation conducted by the DHHR and concluded: "Finding(s): Child neglect has not occurred."

Noreika then had John Law, the DHHR official, meet separately with a WCHS-TV8 cameraman to give a short statement about the investigation and the appeal.

Finally, Noreika visited Kim's Kids Daycare and spoke with a person there (later determined to be Tomblin), who declined to comment aside from indicating that the allegations of abuse were false.

That evening, WCHS-TV8 aired a two-minute story, based on Noreika's reporting.  The story began as follows:

MOTHER: How would you feel if it was your child?

ANCHOR 1: This mother says her child was sexually abused, our top story tonight, the state is investigating a daycare . . . .

ANCHOR 2: Some serious allegations of abuse and neglect have the state keeping a closer eye on a Barboursville daycare.  Eyewitness News reporter Elizabeth Noreika joins us live in the studio on why one parent is speaking out.

NOREIKA: Rick, a mother says she has taken her children out of Kim's Kids child care in Barboursville because she says her young son was sexually abused. The woman asked that we conceal her identity.

MOTHER:  I just can't even describe how I felt, I was just very angry, that my kids were subjected to this.

NOREIKA:  A woman says this daycare in Barboursville abused her trust and her child [screen displays shots of Kim's Kids daycare, including its sign].

MOTHER: He'll probably be scarred for life from it.

NOREIKA:  This mom says she started to worry when her 3-year old began acting different.

MOTHER:  My son was displaying abnormal behavior at home, the minute I saw the behavior, they didn't go back.

NOREIKA:  She alleges her son was sexually abused while at Kim's Kids childcare.  She also says the daycare's workers smoke around children and engage in

5

other inappropriate behavior [screen displays close-up shots of language from the DHHR report].

The broadcast continued with footage of Noreika's visit to Kim's Kids Daycare, which showed Noreika asking an unidentified Kim's Kids employee for comment. The employee responded "sure" and invited Noreika in to discuss the allegations. Narrating, Noreika stated that "workers wanted the camera turned off, saying any and all allegations aren't true." The segment concluded with on-camera statements from Law, the DHHR spokesman, who indicated that the DHHR initially moved to close Kim's Kids but later "had a change of heart" after Tomblin appealed.

An identical story was broadcast later on WVAH Fox News 11, which is an affiliated station.

As a result of the broadcast, Tomblin claimed that she became depressed. She withdrew from her church congregation for several months, lost considerable weight, contemplated suicide, and experienced insomnia. Both Tomblin and her husband also claimed that eight children pulled out of Kim's Kids Daycare following the broadcast.

Tomblin commenced this action in October 2008 against WCHS-TV8 in the Circuit Court of Cabell County, West Virginia, alleging that WCHS-TV8 (1) defamed her by falsely stating or insinuating that she or one of her employees had sexually abused

a child; (2) cast her in a false light by showing her image on the screen during the broadcast, thus implying that she had sexually abused a child; and (3) intentionally inflicted emotional distress by falsely accusing her of such acts. WCHS-TV8 removed the action to the district court and, following discovery, filed a motion for summary judgment.

Granting the motion, the district court determined that all of the statements in the July 17, 2008, broadcast were literally true and that the statements, taken together, did not evince a false implication endorsed by WCHS-TV8. The court rejected Tomblin's false light claim because the footage used of Tomblin in the broadcast simply reflected Noreika's effort to get both sides of the story. Finally, the court found that Tomblin's emotional distress claim failed as a matter of law because the broadcast was not "extreme and outrageous" and was not intended to cause Tomblin emotional distress or aired in such a way that it unreasonably endangered Tomblin's physical safety.

From the district court's order granting summary judgment, Tomblin filed this appeal, claiming that the district court inappropriately resolved questions of fact against her.

7

Tomblin argues that the broadcast was capable of multiple interpretations and could lead a reasonable viewer to believe, falsely, that an adult at the daycare sexually abused a child. She also contends that she presented evidence sufficient to allow a jury to find actual malice on the part of WCHS-TV8, pointing to the fact that Noreika, the reporter, possessed the DHHR report which stated that the incident allegedly involved only a four-year-old boy improperly touching a four-year-old boy, as distinct from an adult abusing a child.

WCHS-TV8 contends that the district court properly entered summary judgment because the statements made in the broadcast were all true in that the mother did in fact allege that her child had been sexually abused. WCHS-TV8 also argues that Tomblin failed to proffer evidence of actual malice, as required to overcome the station's privilege in reporting matters of public concern.

Having reviewed the record carefully, including a copy of the broadcast, we conclude that there are numerous material statements that are capable of multiple interpretations and that a jury could conclude that the broadcasts defamed Tomblin and placed her in a false light.

<u>First</u>, WCHS-TV8 published the statement that "<u>this daycare</u> . . . <u>abused</u> her trust and <u>her child</u>." (Emphasis

8

added).  Yet, the station acknowledges that the daycare did not abuse a child.  It understood that one four-year-old boy may have abused another four-year-old boy.  But it had no evidence that the daycare center or any of its employees abused the boy. WCHS-TV8 rationalizes its publication of the broadcast statement by arguing that the daycare abused the child because the daycare was legally responsible for the abuse.  This is also the position taken by Noreika, the reporter, to justify her reporting of the incident.  In her deposition she explained, "The daycare did not abuse the child," but "what happens in the daycare, no matter who does anything, is the responsibility of the daycare."  This rationalization adopted by both WCHS-TV8 and Noreika does not, however, transform a misleading statement into a true statement.  A reasonable jury could find that this statement was defamatory, inasmuch as there is material difference between a daycare worker actually abusing a child in his or her care, and a daycare worker negligently supervising a child such that he or she is ultimately responsible for one child's assault of another child.

Second, throughout the broadcast, WCHS-TV8 referred to the incident as "sexual abuse."  Yet, the term sexual abuse did not appear in the DHHR report, and there is a genuine issue as to whether the term "sexual abuse" would be misleading to the public in this context.  WCHS-TV8 acknowledges that the assault

9

allegedly involved one child placing his finger in another child's rectum and grabbing the other child's genitals. Because this is an unwanted touching of a sexual organ, it argues that the incident may be characterized as a form of sexual abuse. Yet, the DHHR did not consider it sexual abuse. It did not refer to the incident as an incident of sexual abuse, and it stated, in its subsequent report, "No information was provided that [the four-year-old assaulting child] was sexual, acted out upon or acted out himself while at Kim's Kids Daycare Center." The report also included statements from a staff worker, who was familiar with that child, that "she ha[d] not seen any sexual acting out by [the four-year-old assaulting child]. He has not displayed any sexual behaviors. He did not display any age consistent [sic] sexual behaviors at the center." Moreover, in the context of a report about a daycare center involving the supervision of young children, the term "sexual abuse" is especially alarming and could reasonably lead a rational jury to conclude that the term used in that context indicated that an adult at the daycare sexually abused a child. This issue is thus an appropriate one for jury resolution, not summary judgment.

Third, the broadcast stated numerous times that the daycare was accused of both abuse and neglect, creating a genuine issue of material fact as to whether the broadcast was suggesting that

10

the daycare did more than negligently supervise children; it also abused children. In the introductory statement to the broadcast, the anchor stated "the state is investigating a daycare" amidst "serious allegations of abuse and neglect." From this opening announcement that there was both abuse and neglect at the daycare, a reasonable jury could conclude that the term "abuse" implied that an adult actually abused a child, because the term "neglect" would be sufficient to indicate the simple lack of supervision. This could be significant in the context of the summary given by Noreika, the reporter, who stated that the mother "alleges that her son was sexually abused while at Kim's Kids Daycare. She also says that the daycare workers smoke around children and engage in other inappropriate behavior." Noreika's statement that daycare workers "engage in other inappropriate behavior" could lead a reasonable jury to conclude that the daycare was not only neglectful, its workers were sexually abusing children in their care.

Fourth, we have reviewed the broadcast as a whole and conclude, when taken as a whole, there could be a question of fact as to whether the broadcast produced a false "implication, innuendo or insinuation" about the daycare. See Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70, 77 (W. Va. 1984). The broadcast repeatedly referenced the sexual abuse of a child in the context of a daycare, potentially creating the impression

11

that a daycare worker abused a child. The seriousness and drama with which the broadcast was made, also indicate, something far more serious than the failure to prevent the assault of one four-year-old boy by another.

Finally, on the question of whether WCHS-TV8 deliberately or recklessly conveyed a false message to sensationalize the news and thus to provide factual support for a finding of malice, there are disputed facts. It is undisputed that the broadcast omitted the most important exculpatory detail, that the incident involved one four-year-old boy inappropriately touching another four-year-old boy. Additionally, without disclosing that fact, the broadcast did not simply report the mother's allegation but emphasized the seriousness of the story. When introducing the segment, the anchor stated that "some serious allegations of abuse and neglect have the state keeping a closer eye on the Barboursville daycare." (Emphasis added). While Noreika does assert in her deposition that the child's mother told her that "while at the daycare her child had been sexually abused," the mother in the same context explained her accusation by providing Noreika with a copy of the DHHR report, which gave the details that eliminated the false innuendo. Yet, WCHS-TV8 went on to report the seriousness of the allegations that a mother claimed that her child had been sexually abused without reporting the known details contained in the DHHR

12

report.  Tomblin argues effectively that because the reporter knew the allegations of abuse concerned a child on child contact and yet aired a report that implied that an adult abused a child, a reasonable jury could find malice.

Even though WCHS-TV8 has a qualified privilege to make a "fair comment on matters of public concern," Crump, 320 S.E.2d at 79; Havalunch, Inc. v. Mazza, 294 S.E.2d 70, 75-76 (W. Va. 1981), that qualified privilege is defeated if the speaker acts with malice.  Malice requires that Tomblin prove that Noreika have "a subjective appreciation at the time of publication that either (1) the defamatory statement is false, or (2) the defamatory statement is being published in reckless disregard or whether it is false."  Hinerman v. Daily Gazette Co., Inc., 423 S.E.2d 560, 573 (W. Va. 1992) (emphasis omitted).

If the disputed facts were resolved in Tomblin's favor, the record would provide evidence from which a jury could infer that Noreika acted with reckless disregard of the truth.  While she had a copy of the DHHR report at the time of the broadcast which indicated that a boy was accused of improperly touching another boy, she chose to air a news report suggesting that an adult abused a child, despite her knowledge that there was no allegation of adult on child abuse.  "Where the defendant finds internal consistencies or apparently reliable information that contradicts its libelous assertions, but nevertheless publishes

13

those statements anyway, the New York Times actual malice test can be met." Schiavone Const. Co. v. Time, Inc., 847 F.2d 1069, 1090 (3d Cir. 1988) (citing Curtis Publ'g Co. v. Butts, 388 U.S. 130, 161 n.23 (1967)).

For the reasons given, we conclude that factual questions exist in this case, precluding the entry of summary judgment on Tomblin's defamation and false light claims.

We also conclude that these factual issues preclude entry of summary judgment on the claim for intentional infliction of emotional distress, although the question is substantially closer. Nonetheless, we must be mindful that leveling false accusations of sexual abuse at a daycare is, perhaps, the most outrageous accusation that one could make against that type of institution, which is charged with children's well-being. We have previously acknowledged that the publication of a defamatory statement can be outrageous. When a newspaper named a research scientist as a suspect in mailing anthrax-laced letters without regard for the truth of the accusation, we held that the publisher's conduct rose to the level of outrageous behavior required to establish a claim of intentional infliction of emotional distress under Virginia law. See Hatfill v. New York Times Co., 416 F.3d 320, 336 (4th Cir. 2005). In this case, the accusations made by WCHS-TV8 could similarly be found to be extreme and likely to create a great public reaction.

14

Because Tomblin has alleged that the station aired this accusation without regard for the truth of the matter asserted, a jury could find that WCHS-TV8 recklessly inflicted emotional distress on Tomblin.

Accordingly, we likewise vacate the summary judgment on that claim and remand for further proceedings.

### III

Tomblin also challenges the district court's ruling striking out portions of affidavits she filed from various members of the community who noted that, after watching the broadcast, they believed that a daycare worker abused a child. Tomblin argues that without this evidence, she could not show that one parent pulled her child out of Kim's Kids Daycare because she thought the broadcast meant that an employee had committed sexual abuse or that people in the Barboursville community shunned Tomblin after the broadcast and speculated as to whether "an adult abused a child." The district court's ruling, however, does not go so far as to prevent Tomblin from making her case. The district court only struck from the affidavit expressions of the affiants' subjective impressions about the broadcast, concluding that such impressions would not be helpful to the trier of fact because they would be duplicative of those which could be reached by the jury. The

15

court struck only the inadmissible material and did not prevent Tomblin from using other portions of the affidavits. It actually specified that "other statements contained within the affidavits referring to the state of Mrs. Tomblin's health or the withdrawal of children from the daycare are admissible." Moreover, witnesses could surely testify to the understanding about the daycare that they actually took from the broadcast while watching it. As it stands, we find that the district court reached an appropriate balance between disallowing unhelpful opinion testimony and allowing Tomblin to prove her case. On remand, however, the district court is free to revisit this evidence's evidentiary value as discovery proceeds. At this moment, we do not conclude that the district court abused its discretion.

Tomblin also challenges the district court's decision to strike a portion of an expert report that gave an opinion on how a reasonable viewer would interpret the July 17, 2008 broadcast. The court refused to admit the report on the basis that the expert had not actually watched the broadcast. Because the expert had not seen the video, the court reasoned, his opinions were without proper foundation.

Although the expert did not watch the broadcast prior to preparing his initial report (dated August 24, 2009), he made it very clear in his final report (dated September 3, 2009) that he

16

had seen the broadcast. Moreover, both reports were filed several months before the district court issued its ruling on the report. Accordingly, we reverse the district court's evidentiary ruling with respect to the expert's report. But again, on remand the district court is free to review the expert report in its broader context.

IV

For the reasons given, the summary judgment entered by the district court is vacated, and the case is remanded for further proceedings. The district court's ruling on the community members' affidavits is affirmed, and the district court's ruling on the expert report is reversed.

IT IS SO ORDERED.

DAVIS, Circuit Judge, dissenting:

I would affirm the judgment of the district court.

I.

A.

On July 17, 2008, WCHS-TV8, a local ABC affiliate, aired a newscast regarding allegations involving Kim's Kids Child Care in Barboursville, West Virginia.[1] The WCHS broadcast aired at 11:00 p.m.,[2] and the daycare story was the first story of the evening. The anchor offered this lead into the story: "Serious allegations of abuse and neglect have the State keeping a closer eye on one Barboursville daycare." J.A. 36. Reporter Elizabeth Noreika was also in the studio and began her story by saying, "[A] mother says she's taken her children out of Kim's Kids Child Care center in Barboursville because she says her young son was sexually abused." J.A. 36. A brief statement by the mother followed, whose image and voice were concealed, expressing her anger at her son's experience. Noreika continued, "A woman says this daycare in Barboursville abused her trust and her child." J.A. 37. As Noreika spoke, images of the exterior of the daycare center, including signs identifying it, were shown.

---

[1] Plaintiff-Appellant Kim Tomblin is the director and co-owner of the daycare.

[2] A nearly identical broadcast aired at 10:00 p.m. on WVAH Fox11 News, a sister station.

18

The mother again appeared, explaining how she had noticed changes in her son's behavior. Noreika then stated that the mother "alleges that her son was sexually abused while at Kim's Kids Child Care. She also says that the daycare's workers smoke around children and engage in other inappropriate behavior." J.A. 37. The image cut to Noreika knocking on the daycare's front door, which was answered by an unidentified woman.[3] Noreika introduced herself and explained that she wanted to speak to "someone who worked here about some allegations that were made against the daycare." J.A. 37. The woman replied, "Sure," on camera, but Noreika explained that "workers wanted the camera turned off, saying any and all allegations aren't true." J.A. 38.

The broadcast described an investigation by the state Department of Health and Human Resources (DHHR) into the allegations, with Noreika noting, "A spokesperson for the Department of Health and Human Resources says an investigation has only turned up signs of worker inattentiveness, but DHHR says it was enough to close the facility." J.A. 38. John Law, Communications Director for DHHR, explained that DHHR had advised Kim's Kids that its license would probably not be

---

[3] Plaintiff-Appellant Tomblin is the woman who opened the door, but she is not identified by name or as an owner of the daycare in the broadcast.

19

renewed, but that Kim's Kids had appealed and DHHR was "working closely with them" on the problems. J.A. 38. Noreika ended by noting that the mother wanted the daycare closed and that DHHR was not allowing the daycare to accept new children while its appeal was pending. The story was about two minutes in length.

B.

The allegations at issue in the WCHS broadcast were the subject of a DHHR investigation in June 2008. The investigation report contained the following allegation: "A boy at Kim's Kids touched [child's name] inappropriately by sticking his finger in his rectum and grabbing his genitals. [Child's name] is now displaying these behaviors." J.A. 27. Although the summary found that "the possibility that such an incident could occur is likely," the agency determined that "[c]hild neglect has not occurred." J.A. 27. Nonetheless, the report found a lack of effective supervision and evidence of smoking by daycare employees that warranted further review given the "history of non-compliance and continuation of the same issues." J.A. 28. The term "sexual abuse" was not used in the DHHR report.

In July 2008, DHHR notified Tomblin that her license would not be renewed and ordered the daycare to cease operation by July 15, 2008. The agency's notice stated that its decision was based on the "repeated violations over the past two years," including the inability or unwillingness to "properly supervise

20

children." J.A. 189. Tomblin appealed the agency determination and was permitted to continue to operate the daycare while the appeal was pending. Following an administrative hearing on November 12, 2008, the agency's decision was upheld.

The hearing report set forth reasons for upholding the agency's decision not to renew the license. In particular, the hearing officer heard testimony from DHHR officials who said that the daycare had previously been cited for non-compliance in 2006 and 2007, when children were found to be unsupervised, sign-in sheets were incomplete, playground equipment failed to meet regulations, and infants were found strapped in car seats. As a result of these earlier problems, Kim's Kids' license had been made provisional as of December 2007. With respect to the allegations at issue in the WCHS broadcast, the hearing officer heard testimony from the investigating DHHR officer who noted that, although allegations of abuse or neglect were not substantiated, he had found evidence of regulatory violations. Tomblin states that the administrative decision was appealed and that Cabell County Circuit Court reversed the agency's decision and ordered her license restored on July 27, 2009.

C.

WCHS learned of the allegations against Kim's Kids when the station received a phone call on July 17, 2008, from the mother who had complained that her child had been inappropriately

touched while at the daycare. Reporter Noreika was assigned to cover the story, and she called the mother and set up a meeting with her. Prior to meeting the mother, Noreika testified on deposition that she called John Law, Communications Director of DHHR, who agreed to be interviewed for the news report. Noreika testified that when she met with the mother, the mother told Noreika "her opinion that Kim's Kids abused her trust and her child," repeating the allegations regarding what had happened to her son at the daycare. J.A. 276. She also showed Noreika a copy of the DHHR investigation report, which Noreika read and the cameraman took video of.

From the report, Noreika was aware that the allegations involved two children at the daycare and that the agency had determined that child neglect had not occurred, though she also knew that the investigation had found "numerous infractions," including lack of supervision and smoking. J.A. 276; 314-15. Noreika then went to Kim's Kids to discuss the allegations with employees there, but, after initially being invited in, was refused further answers other than denial of the allegations. Noreika testified that she sought comment from Kim's Kids "to show that we tried to get both sides in this case." J.A. 277. Noreika again checked in with Law, informing him that the daycare had refused comment. She noted that, "[a]lthough he could not talk about the specifics of the allegations because an

22

appeal is pending, Mr. Law verified during that call that the daycare was under investigation." J.A. 277. After writing her report, Noreika called Law once again and read him the script, testifying that "Law approved the script exactly as written by indicating that he was fine with it." J.A. 278. Law subsequently witnessed the taping of the report and expressed no concerns. Moreover, Noreika noted that another WCHS reporter and the news director reviewed and approved the report before it aired.

Noreika testified that she decided to include the sexual abuse allegation in the broadcast because "it was an allegation. Whether or not it was found to be abuse or not, it was still an allegation. It was still a concerned mother alleging that her child was, in fact, sexually abused while in daycare." J.A. 317f. In response to questioning as to why she did not make clear who was accused of the sexual abuse, Noreika responded: "Well, that wasn't the point. The point is that this daycare was being investigated. Who did the abusing isn't the point. The point is that . . . it happened in the daycare." J.A. 317e.

D.

On July 19, 2008, two days after the broadcast, Billy Tomblin, Kim's Kids co-owner and Kim Tomblin's husband, contacted WCHS regarding the news broadcast. Billy Tomblin went to the station and taped an interview with Bryant Somerville, another WCHS reporter. Portions of the interview were aired as

23

the top story of the 6:00 p.m., 10:00 p.m., and 11:00 p.m. newscasts that evening. Kim Tomblin testified that she thought her husband's interview "did an excellent job trying to make a retraction" but felt that it should have run more frequently throughout the weekend and into Monday.

According to Kim Tomblin's review of the daycare's records, as supported by the affidavit of her employee, Christy Glover, at least six families withdrew their children from the daycare after the July 17 broadcast. One of those parents, Sara Miles, submitted an affidavit explaining that she decided to withdraw her children from Kim's Kids after reading a transcript of the WCHS broadcast on the internet. Moreover, Tomblin submitted affidavits from former clients, employees, and family members that attested to the change in her reputation in the community as a result of the broadcast as well as changes in her mental and physical health. Tomblin also provided the report of Timothy Saar, a licensed psychologist, who stated that Kim Tomblin presented symptoms of depression and anxiety and that she had not displayed such symptoms prior to the broadcast. Tomblin's affidavits set out the physical and emotional toll the broadcasts took on her, including weight loss, depression, irritability, marital problems, and feelings of being shunned in her community.

II.

Tomblin brought suit in state court against WCHS on October 14, 2008, alleging defamation, false light invasion of privacy, and intentional or negligent infliction of emotional distress. In particular, Tomblin claimed that the station falsely insinuated that a daycare employee sexually abused a child and, because images of her person were part of the story, it implied that she sexually abused a child. Appellee removed the action to federal court on the basis of diversity of citizenship.

Upon the completion of discovery, on August 12, 2009, WCHS filed a motion for summary judgment and a motion to strike certain opinion testimony from the summary judgment record. On January 21, 2010, the district court granted in part and denied in part WCHS's motion to strike and it granted WCHS's motion for summary judgment. Tomblin v. WCHS-TV8, 2010 WL 324429 (S.D.W.Va. Jan. 21, 2010).[4] This appeal followed.

III.

On appeal, Tomblin principally contends that the district court erred in granting defendant's motion for summary judgment. This court reviews a grant of summary judgment de novo. Hill v.

---

[4] My view of the dispositive issues in this appeal makes it unnecessary for me to address the district court's rulings on the disputed evidentiary issues.

Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 283 (4th Cir. 2004) (en banc).

## A.

Although it is undisputed that West Virginia law governs Tomblin's claims, including her defamation claim, this court has noted that "the First Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1091-92 (4th Cir. 1993). Where the plaintiff is a private person claiming she was defamed by a media defendant on matters involving the public interest, courts may "not impose liability without requiring some showing of fault." Havalunch, Inc. v. Mazza, 294 S.E.2d 70, 73 (W. Va. 1981) (citing Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)).

Accordingly, to make out a defamation claim under West Virginia law, a private individual must show (1) a defamatory statement; (2) a non-privileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) negligence, at minimum, on the part of the publisher; and (6) resulting injury. Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70, 77 (W. Va. 1983). The plaintiff bears the burden of proving both falsity

and fault against media defendants in matters of public concern.[5] Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1986). In assessing the falsity of an allegedly defamatory statement, a court "overlooks minor inaccuracies and concentrates upon substantial truth." State ex rel. Suriano v. Gaughan, 480 S.E.2d 548, 561 (W. Va. 1996) (internal quotations and citations omitted).

Here, the district court granted Appellee's motion on the basis that Tomblin could not demonstrate the requisite element of falsity. In particular, the court determined that the statements that Tomblin complains of in the broadcast were "factually accurate and non-actionable as direct defamation." 2010 WL 324429, at *6. The court noted that it did not need to decide whether Tomblin was a public figure, as "she has not provided evidence to support a cognizable claim under the more lenient test for a private party plaintiff." 2010 WL 324429, at *5 n.2. On appeal, Tomblin challenges the district court's determination that the statements in the broadcast were all

---

[5] That allegations of abuse and resultant investigations involving the only licensed daycare in a particular locality would be considered a matter of public concern appears unexceptional. See Snyder v. Phelps, 131 S. Ct. 1207, 1216 (2011) (noting that, although "the boundaries of the public concern test are not well defined," its scope encompasses matters of public concern that can "be fairly considered as relating to any matter of political, social, or other concern to the community") (internal citations and quotation marks omitted).

literally true, focusing on two of Noreika's statements, in particular: (1) the statement that a mother had reported that her child had been "sexually abused while at the daycare" and (2) the statement that "[a] woman says this daycare in Barboursville abused her trust and her child." J.A. 36-38.

Although Tomblin's brief blurs the line between direct and indirect defamation, I will address each of the disputed statements under her direct defamation claim before turning to her claim of implied defamation.

1.

First, Tomblin contends that "sexual abuse" is not an accurate term for the mother to have used to describe the conduct at issue. This argument is without merit. The mother alleged, as evidenced both by the DHHR report and her statements to Noreika, that another child stuck his finger in her son's rectum and grabbed his genitals. I agree that, as a matter of law, this conduct may fairly be "characterized as abuse of a sexual nature." 2010 WL 324429, at *6. Tomblin argues that the DHHR did not categorize the incident as sexual abuse, but rather framed it as an issue of ineffective supervision. How the state agency chose to categorize the incident, however, is not dispositive of the issue of falsity of the mother's statement as reported by the station.

28

It seems quite natural to me that a parent would focus on the acts committed against her child and not necessarily on the technical or administrative categorization of the type of infraction. One of DHHR's representatives testified on deposition that the specific allegations found in the DHHR report and the news story "[i]n broad terms," "both relate to sexual abuse" and that, while the "broad statement 'sexual abuse' does not give an indication that it was abuse between two children," "typically what you get in news reports and in the media usually doesn't tell the whole story at any time." J.A. 250-51. Because, so viewed and as a matter of law, the mother's statement is "substantially true,"[6] Tomblin fails to project evidence sufficient to carry her burden to show falsity.

Second, Tomblin argues that the statement that the mother claimed the "daycare . . . abused her trust and her child" is false because the daycare did not abuse the child. This argument is also without merit. The statement was properly attributed to the mother, and the statement plainly constitutes a mother's belief as to what happened to her child at the daycare. This court has noted that, when a reporter is repeating the

---

[6] I note that this would be a different case if the mother had not actually made the statement to the reporter or if the reporter had misquoted the mother. However, on the record before us, we have only Noreika's undisputed testimony that the mother made these statements to her.

defamatory statements of another, liability may attach if there are "reasons to doubt the veracity of the informant or the accuracy of his reports." Fitzgerald v. Penthouse Intern., Ltd., 691 F.2d 666, 670 (4th Cir. 1982) (applying the actual malice or recklessness standard required for public figures).

Here, Tomblin again fails to project evidence sufficient to carry her burden to demonstrate the falsity underlying the mother's statement. See Hepps, 475 U.S. at 776. Although the DHHR investigation was not able to corroborate the mother's allegations (a fact noted by Noreika in her story), its investigation report noted that "the possibility that such an incident could occur is likely." J.A. 27. Laura Sperry, a DHHR representative, testified on deposition that "eyes on" supervision is required at a daycare and could have prevented the kind of inappropriate sexual touching alleged by the mother. J.A. 158; 409. Although DHHR does not categorize the lack of supervision as "child abuse," it held the daycare responsible for continued violations involving failure to properly supervise the children under its care. In response to questions regarding the mother's allegations of abuse during her deposition, Noreika stated:

> She's alleging that the abuse happened at the daycare. When a child is in a daycare, it's the daycare's responsibility what goes on in that daycare. . . . What I meant was that nowhere does it say a worker abused a child. But is it the responsibility of the

30

daycare itself to look after children when they're in there and to make sure stuff doesn't happen? Yes, it's their responsibility.

J.A. 457. Tomblin admitted to such a responsibility in her deposition, agreeing in response to a question that it would be "legitimate" for a parent to believe that "the trust relationship has been broken" if a child is inappropriately touched while at a daycare regardless of "whether it was by another child or by a staff member." J.A. 111-12. Consequently, the mother's statement blaming "the daycare" for abuse because it failed to provide adequate supervision, when supported by the DHHR investigation into lack of proper supervision, is not demonstrably false and not actionable as direct defamation.

2.

Having disposed of Tomblin's contentions with respect to her claim of direct defamation, I turn now to address her claim of indirect defamation. Tomblin argues that, as a result of the omission of the fact that it was a child that was alleged to have inappropriately touched another child, the news broadcast created a "false implication that an adult at the daycare, specifically the adult whose face was shown in the broadcast, was accused of sexually abusing the child." Appellant's Br. 25. On appeal, Tomblin challenges the district court's conclusion that the reporter's omission of a relevant fact failed to establish Appellee's endorsement of the false implication.

31

Because the evidence, even viewed in the light most favorable to Tomblin, does not reasonably demonstrate that the station endorsed or intended the false implication suggested by Tomblin, I would affirm the district court's order with respect to this claim.

The range of meanings reasonably ascribable to the term "sexual abuse" lies at the root of this dispute. I do not contend that the term is incapable of a defamatory meaning. See Crump, 320 S.E.2d at 77 (noting that a statement is defamatory "'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him'") (quoting Restatement (Second) of Torts § 559 (1977)). Certainly, accusations of sexual abuse at a daycare would reflect poorly on those responsible for that facility, regardless of the specific circumstances involved. Nonetheless, the defamatory nature of the term is not at issue in the case before us; rather, Tomblin's claim turns on the element of falsity (which I addressed supra) and the intent to communicate a defamatory implication.

Although many people of good will and average intelligence might agree that in the present circumstances the term "sexual abuse" connotes abuse by an adult of a child, the idea that an adult at the daycare sexually abused a child is an implication

32

of the disputed broadcast, and is never explicitly stated. Consequently, the dispositive issue is whether Appellee can be held liable for this implication. In my view, for the reasons I discuss below, the record here presents factual questions which, as a matter of law, no rational trier of fact could reasonably resolve to support a claim that Appellee intended or endorsed the implication that an adult at the daycare abused a child. Consequently, the district court appropriately resolved this case at the summary judgment stage.[7]

West Virginia has recognized that "[d]irect defamatory statements are not an absolute prerequisite to recovery . . .

---

[7] I disagree with the majority's view that the record presents genuine questions of material fact from which a rational trier of fact reasonably could find implied defamation. Even accepting the majority's view, however, I fail to discern in the majority opinion any useful guidance offered to the district court as to how to instruct the jury. And, the district court will need to instruct whatever jury is finally selected as to the elements and burdens of proof required to prove defamation-by-implication because Tomblin's defamation-by-implication claim poses a high risk that a juror will be seized by passion or sympathy and render an unsupported verdict.

It requires no reminder that, in a civil action, the plaintiff loses where she is unable to carry her burden of proof to establish the elements of her claim by a preponderance of the evidence. Thus, it was entirely appropriate for the district court to scrutinize carefully whether substantial probative evidence, and not simply a scintilla of evidence, was available to Tomblin to maintain her claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to withstand summary judgment.) (alteration added).

because defamation may also be accomplished through inference, implication, innuendo or insinuation." Crump, 320 S.E.2d at 77. However, a plaintiff asserting a claim of defamation by implication must meet a higher bar to establish her claim. In particular, where the stated facts are "literally true," the language must "not only be reasonably read to impart false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." Chapin, 993 F.2d at 1092-93 (internal citations omitted). Although the Chapin case involved the interpretation of Virginia's libel law, the court's statement with regard to the "especially rigorous showing" required for a claim of defamation by implication was made in reference to the constitutional protections provided by the First Amendment to media outlets reporting on matters of public concern. See id.

This court is not alone in finding that constitutional protections require a greater showing to prove defamation by implication. The Eighth Circuit, in a suit against a news magazine for its report of rape allegations involving a public figure, affirmed the district court's grant of summary judgment on the implied defamation claim "because the article in question cannot be read to imply that Newsweek espoused the validity of the rape allegation" where the facts reported were materially accurate. Janklow v. Newsweek, Inc., 759 F.2d 644, 649 (8th Cir.

34

1985), reheard on other grounds, 788 F.2d 1300 (8th Cir.) (en banc), cert denied 479 U.S. 883 (1986). Similarly, the D.C. Circuit has required a public figure plaintiff claiming defamation by implication to show "affirmative conduct" that suggests the broadcaster "intends or endorses the inference." White v. Fraternal Order of Police, et al., 909 F.2d 512, 520 (D.C. Cir. 1990). In a defamation-by-implication claim by a state court judge against a television station, the Ninth Circuit agreed that a "subjective or actual intent is required" to make out such a claim. Dodds v. American Broadcasting Co., 145 F.3d 1053, 1064 (9th Cir. 1998) (noting that "all the courts of appeal that have considered cases involving defamation by implication have imposed a similar actual intent requirement"). See also Johnson v. Columbia Broadcasting System, Inc., 10 F. Supp. 2d 1071, 1075 (D. Minn. 1998) (finding intent requirement for implied defamation cases "equally applicable" to cases involving private figures).

The more stringent requirements to prove implied defamation also appear to be consistent with West Virginia law. Under West Virginia law, "[e]vidence that a media defendant intentionally . . . omitted facts in order to distort the truth may support a finding of actual malice . . . ." Dixon v. Ogden Newspapers, Inc., 416 S.E.2d 237, 244 (W. Va. 1992). The language in Dixon suggests that West Virginia also requires actual intent or

35

endorsement of the false implication. Id. (noting that plaintiff's claim should fail unless defendant newspaper intentionally omitted relevant facts "in order to leave readers with the [false] impression" alleged) (emphasis added). Cf. Hinerman v. Daily Gazette Co., Inc., 423 S.E.2d 560, 572 (W. Va. 1992) (requiring public figures to demonstrate "a subjective appreciation at the time of publication that either (1) the defamatory statement is false or (2) the defamatory statement is being published in reckless disregard of whether it is false").[8] These exacting standards requiring intent or endorsement are not satisfied on the present record.

---

[8] The majority's quotation of this passage from Hinerman in connection with its discussion of West Virginia's qualified privilege for "fair comment" is somewhat confusing. Maj. Op. at 13. The court in Hinerman took pains to disentangle the privileges claimed by defendants in that case, noting that the "fair comment" privilege "accorded the media wide latitude for editorial opinion," whereas the "fair report" privilege protected fair and accurate reports of official action regarding matters of public concern. 423 S.E.2d at 577-78. The court then proceeded to reject the defendants' attempts to "shuffle the two privileges to create an editorial that is primarily a recitation of alleged facts where the reader is led to believe that the editorial writer believes the reported unsubstantiated facts, which are indeed untruths or half-truths." Id. at 578. While the "fair report" privilege might fairly be implicated in this case, I fail to see how "fair comment" comes into play in the news report at issue here. With respect to the "fair report" privilege, this court has noted that it may be lost where "the press plainly adopts the defamatory statement as its own." Chapin, 993 F.2d at 1098 (emphasis added). Clearly, as the district court noted, there is some overlap between West Virginia's fair report privilege and the endorsement requirement for implied defamation. 2010 WL 323329, at *7.

36

Tomblin cites to several cases to bolster her claim, but they do not provide the support necessary for her to avoid summary judgment on this record. She cites Schiavone Construction Co. v. Time Inc., where the court found a grant of summary judgment inappropriate in a defamation claim against a magazine for an article about the FBI's investigation of former U.S. labor secretary Robert Donovan. 847 F.2d 1069 (3d Cir. 1988). The article in question omitted an exculpatory fact about the plaintiff, but included a statement implying that his alleged connections to organized crime would have negatively influenced the Secretary's confirmation hearings in the Senate. Id. at 1072. The Third Circuit found that the exclusion of the exculpatory information with the inclusion of the suggestive comments exceeded the bounds of fair reporting and precluded summary judgment for the defendants. Id. at 1092.

Similarly, in Hinerman, which Tomblin also cites, the West Virginia court affirmed the lower court's finding of libel in a suit against a newspaper for an editorial that included only the bad facts and not one of the exculpatory facts that came out of the hearing that was the subject of the editorial. 423 S.E.2d at 578. In that case, as in Schiavone, the author included "caustic and vituperative" editorial comment in addition to the abridged facts. Id. Neither of these cases is on point, as the courts in

37

both relied on the editorial commentary, in addition to the omission of certain facts in order to find the claim actionable.

Here, Tomblin has failed to project sufficient probative evidence to demonstrate that the statements in the broadcast were false; further, she is unable to point to any suggestive or inappropriate editorial comment in the broadcast that would make this case resemble the facts in Schiavone or Hinerman. Despite the fact that the report left out relevant details, even highly relevant details, the record shows that the reporter made a variety of efforts to investigate the mother's allegations and presented the results of the DHHR's own investigation into the allegations. Thus, the report, taken as a whole, fails to create a genuine issue of material fact from which a rational trier of fact could find any evidence that Appellee intended or endorsed the false implication alleged by Tomblin.

The summary judgment record would not permit a rational trier of fact to reasonably find that Appellee intended to imply that an adult sexually abused a child at the daycare. Specifically, Noreika testified on deposition, without contradiction in the record before us, that before meeting the mother, she called Law, a spokesperson for DHHR. She spoke to him again after her interview with the mother, informing him of what she had learned from the mother. Noreika testified that Law said he could not talk about the allegations, but confirmed that

the daycare was under investigation. Noreika then attempted to interview someone from the daycare who could address the allegations, but was asked to leave before she could complete her interview. She called Law upon leaving the daycare and again after she wrote her story, reading the script aloud to him. Noreika also testified that her report was reviewed by another reporter and the news director.

Moreover, the broadcast itself fails to provide any indication that Appellee endorsed the implication that an adult at the daycare abused a child. During the broadcast, Noreika stated that the DHHR investigation had only turned up worker inattentiveness. DHHR spokesperson Law presented the agency's position during the broadcast. In her affidavit in support of defendant's motion for summary judgment, Noreika explained that the "point of the Report was to let people know that Kim's Kids Daycare was investigated by the DHHR following a mother's allegations of abuse that occurred at the Daycare. . . . However, the specifics of the allegations were unimportant to the Report, therefore they were characterized in nature only and the Report did not identify or describe the people involved or the specific acts alleged." J.A. 279. The inclusion of multiple viewpoints and the reporting of the results of the agency's investigation do not support Tomblin's contention that the omission of the details of the incident or inclusion of the

39

brief image of her face (captured in an effort to get her to talk about the allegations on camera) indicate an endorsement by Appellee of the implication that an adult, and specifically Kim Tomblin, had engaged in the sexual abuse alleged.[9] Because Tomblin fails to show the requisite endorsement or intent required for defamation by implication, her claim based on indirect defamation also fails.[10]

---

[9] Under the majority's approach, the following two scenarios would be treated exactly the same:

(1) when the daycare owner is interviewed during the preparation of the broadcast report, she discloses, on camera, the detail that the inappropriate touching alleged was child-on-child contact. Then, when the story is broadcast, the portion of the tape showing Tomblin explaining the detail is omitted;

(2) this case, the daycare owner is also offered the opportunity to present her view of the facts, but she declines to make any statement on camera and simply denies the truth of the allegations while she is off-camera. Then, when the story is broadcast, the broadcaster, aware that the allegations related to child-on-child contact, includes the owner's denials, but omits that detail.

In my view, the first scenario provides affirmative evidence of the broadcaster's intention to make the defamatory implication; the case should go to the jury. In contrast, the second scenario, which involves merely an omission, provides no more than a scintilla of evidence of the broadcaster's intention, and the case should be resolved on summary judgment in favor of the broadcaster and against the plaintiff, who bears the risk of non-persuasion.

[10] In concluding that, as a matter of law, defamation by implication cannot be shown in this case, I do not intend to commend the journalistic integrity of Appellee. Allegations of sexual abuse grab a viewer's attention more than headlines concerning lack of supervision; by choosing to frame its report around the mother's allegations of sexual abuse, Appellee appears to have engaged in the kind of titillation that drives
(Continued)

                          *    *    *

     For the reasons set forth above, I would affirm the
district court's resolution of the defamation claims asserted
here as a matter of law in favor of Appellee.

                               B.

     Tomblin also challenges the district court's grant of
Appellee's motion for summary judgment as to the false light
invasion of privacy claim. Under West Virginia law, "defamation
and invasion of privacy remain distinct theories of recovery
entitled to separate consideration." Crump, 320 S.E.2d at 81.
Further, "the 'right of privacy' does not extend to
communications which are . . . matters of legitimate public
interest." Id. at 85. A court must not "consider words or
elements in isolation, but should view them in the context of
the whole article to determine if they constitute an invasion of
privacy." Id. at 87. For a successful false light claim, "the
matter publicized as to the plaintiff must be untrue." Id.
Although a private figure need only prove negligence in
publishing the statement, where a "legitimate matter of public

_____

too much of our contemporary news media. Still, while one may
deplore this tendency toward sensationalism, I do not believe
that common law defamation actions can overcome the
constitutional protections for speech involving matters of
public concern in the absence of some affirmative conduct that
demonstrates the media defendant's endorsement of the false
implication.

                               41

interest is involved" and where "a logical nexus exists between the plaintiff and the matter of public interest," even a private figure plaintiff must show "knowledge of falsity or reckless disregard for the truth." Bell v. Nat'l Republican Congressional Cmte., 187 F. Supp. 2d 605, 617 (S.D. W. Va. 2002) (finding nexus lacking between plaintiff and matter of public concern addressed by pamphlet). Because Tomblin fails to show that the broadcast portrayed her in a false light, this claim fails.

Tomblin argues that whether the broadcast portrayed her in a false light is a question for the jury and should not have been decided by the district court at the summary judgment stage. For support, Tomblin attempts to analogize the facts of her case to the Crump case, where the West Virginia court reversed a grant of summary judgment. 320 S.E.2d at 90. The plaintiff in that case was a female coal miner whose image appeared in defendant's newspaper with her consent in a 1977 article about female coal miners. Id. at 75. In 1979, in an article regarding the difficulties facing female coal miners, which did not mention plaintiff by name, the paper used another photo of plaintiff, also taken as part of the 1977 story, but without plaintiff's knowledge or consent. Id. The court found an issue of material fact: "whether the statements in the article involved referred to the appellant" and noted that, when the communication at issue "does not clearly favor one construction

42

over another, the determination of what light it places the plaintiff is for the jury." Id. at 90. The court stated that these two questions went to "the key factual issue upon remand": "whether the article implied that Crump had suffered harassment in the course of her employment, thereby either defaming her or placing her in a false light before the public." Id. Tomblin contends that a jury should decide whether the "misleading and incomplete" news story in which her image appeared placed her in a false light.

Manifestly, Tomblin's analogy to Crump is inapt, and the undisputed facts here, viewed in the light most favorable to Tomblin, fail to create a genuine issue of material fact that would defeat summary judgment. In particular, Tomblin's situation differs from Crump's in that her connection to the story in which her image appeared was clear. In Bell, a cropped photograph of the plaintiff standing next to a political candidate was published under a caption stating that the candidate had represented sex offenders. 187 F.Supp.2d at 617. The district court there found that the privilege for reporting on matters of legitimate public interest did not apply because there was no nexus between the private figure plaintiff's image and the implication of the caption. Id.

Here, it is undisputed that Tomblin was the owner and director of the daycare that was the focus of the news story and

43

the subject of the mother's allegations. The investigation of a licensed daycare was a matter of public concern to the community served by the TV station. As such, Tomblin had a clear connection to a news story in which she was pictured.[11] Moreover, as the district court noted, "The duration of the [sic] Ms. Tomblin's presence on camera is a few seconds at most and does not extend into portions of the story stating the mother's opinions and allegations." 2010 WL 324429, at *10. The district court also credited Noreika's testimony regarding her inclusion of the footage from the daycare:

> Ms. Noreika stated in affidavit that this portion of video was intended to show the reporter's attempt to get both sides of the story. This is a legitimate connection, and a valid message for the news organization to send its viewers. There is nothing in the broadcast to suggest that this woman who opened the door played a larger role in the allegations, further distinguishing this case from Crump, where the plaintiff's picture was the only image next to a complete article.

Id.

Because Tomblin fails to project more than a scintilla of evidence to show how the broadcast portrayed her in a false light in its story about allegations involving her daycare, this claim fails.

---

[11] To the extent that Tomblin's false light claim rests on the alleged implication that an adult at the daycare sexually abused a child such that the inclusion of her image showed a reckless disregard for the truth, it fails for the same reasons as her implied defamation claim fails. See Section II.A.2 supra.

44

C.

Tomblin also challenges the district court's grant of summary judgment on her claim of intentional or negligent infliction of emotional distress. Because Tomblin's emotional distress claims fail as a matter of law, the district court was right to grant summary judgment.

Under West Virginia law, to establish a prima facie case for intentional infliction of emotional distress, a plaintiff must show

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Philyaw v. Eastern Associated Coal Corp., 633 S.E.2d 8, 13 (W. Va. 2006) (internal citations and quotations omitted). Claims of negligent infliction of emotional distress in West Virginia, moreover, are unlikely to prevail where the facts "do not pertain to the threatened health or safety of the plaintiff or a loved one of the plaintiff." Brown v. City of Fairmont, West Virginia, 655 S.E.2d 563, 570 (W. Va. 2007) (internal citations omitted)).

45

Tomblin fails to show that Appellee's conduct was outrageous or that it acted recklessly or with intent to inflict emotional distress. As I discuss above in my analysis of both the defamation and false light claims, the news broadcast about Tomblin's daycare was substantially true and did not portray her in a false light. Given that description, it is difficult to see how the broadcast could also be "so extreme or outrageous as to exceed the bounds of decency." See Philyaw, 633 S.E.2d at 13. Nor can a claim that the station intended to inflict emotional distress be upheld in light of the undisputed fact that the reporter attempted to get both sides of the story and did not endorse or intend any false implication created by the report. As Tomblin's claims for infliction of emotional distress are derivative of her earlier claims, they fail as do the others as a matter of law.

Finally, with regard to the negligent infliction claim, Tomblin fails to demonstrate how Appellee's actions threatened her safety or that of her loved ones. Because Tomblin cannot establish a prima facie case of either intentional or negligent infliction of emotional distress, the district court's grant of summary judgment on this claim should be affirmed.

IV.

For the reasons set forth, I would affirm the judgment of the district court.